## In re CARDIZEM CD ANTITRUST LITIGATION.

No. 99–MD–1278.
MDL No. 1278.

United States District Court,
E.D. Michigan,
Southern Division.

Oct. 10, 2003.

---

1. The Franchise Agreement was attached to Defendant's Motion as Exhibit 1.

See also 332 F.3d 896.

Stephen Lowey, Richard W. Cohen, Lowey, Dannenberg, White Plains, NY, Lowey Dannenberg Benporad & Selinger, P.C., Joseph J. Tabacco, Todd Seaver, Berman De-

Valerio Pease Tabacco Burt & Pucillo, San Francisco, CA, for State Law Plaintiffs, Aetna, Inc., Cobalt Corporation and Charles Zuccarini.

Paul F. Novak, Attorney General of Michigan, Lansing, MI, Robert Hubbard, Attorney General of New York, Liason Counsel for Plaintiff States.

Joseph Rebein, James Eiszner, Joseph Matye, Shook Hardy & Bacon, Kansas City, MO, for Aventis, Inc.

Louis M. Solomon, Hal S. Shaftel, Michael S. Lazaroff, Proskauer Rose, LLP, New York City, for Andrx Pharmaceuticals, Inc.

## ORDER NO. 76

### MEMORANDUM OPINION GRANTING (1) JOINT MOTION OF STATE LAW CLASS PLAINTIFFS AND STATE ATTORNEYS GENERAL FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION; (2) STATE LAW CLASS PLAINTIFFS' COUNSELS' JOINT PETITION FOR ATTORNEYS' FEES, REIMBURSEMENT OF EXPENSES AND INCENTIVE AWARDS FOR NAMED PLAINTIFFS; AND (3) STATE ATTORNEYS' GENERAL MOTION FOR ATTORNEYS' FEES AND ENFORCEMENT COSTS

EDMUNDS, District Judge.

This matter came before the Court at an October 1, 2003 hearing on (1) the joint motion of State Law Class Plaintiffs and State Attorneys General for final approval of the Class Action Settlement and Plan of Allocation, (2) State Law Class Plaintiffs' counsels' joint petition for attorneys' fees, reimbursement of expenses and incentive awards for Named Plaintiffs, and (3) State Attorneys' General motion for attorneys' fees and enforcement costs. The Court preliminarily approved the Class Action Settlement on January 29, 2003. (Order No. 59.) A fairness hearing was conducted on October 1, 2003. Upon careful consideration of the above-referenced motions, briefs, affidavits, declarations, and exhibits filed in support of these motions, the objections to the proposed Class Action Settlement, and party representations at the October 1, 2003 fairness hearing, this Court GRANTS Plaintiffs' motions.

## I. Background

### A. State Law Plaintiffs' Class Action

These cases began after an intensive private investigation, conducted by Co–Lead Counsel for the State Law Plaintiffs in June 1998, two months before the first class action case was filed. Lowey Dannenberg Bemporad & Selinger ("LDBS") was informed of the existence of the September 1997 HMRI/ Andrx Agreement by a confidential source in June 1998. Thereafter, LDBS engaged in an intensive pre-litigation investigation of factual and legal issues relevant to this litigation. (Pls.'s Motion, 9/22/03 Lowey Decl. (describing in detail pre-litigation investigation).) In August 1998, Norman Morris, a California pharmacist, and Betty Morris, his wife who was a consumer of Cardizem CD, retained LDBS and Co–Lead Counsel Berman DeValerio Pease Tabacco Burt & Pucillo ("BDPT") to commence the first lawsuit related to the September 1997 HMRI/Andrx Agreement. LDBS and BDPT filed a comprehensive California state law complaint on the Morris's behalf in California state court on August 20, 1998 as a putative class action (the *"Betnor* action"). The following day, *The Wall Street Journal* published a story concerning the *Betnor* complaint. This publicity led to inquiries to Co–Lead Counsel from in-house counsel at Aetna and Cobalt (formerly known as "United Wisconsin Services"), the parent company of Wisconsin Blue Cross, about the possibility of their serving as class representative plaintiffs.

Within several months, actions were filed in 11 different states and the District of Columbia. All were filed in state courts, under state antitrust and related laws, by consumers and health insurers. In late 1998 and early 1999, various wholesalers, or retailers who had obtained assignments of claims from wholesalers, filed direct purchaser class actions under the Sherman Antitrust Act, reiterating the allegations of the *Betnor* complaint, but asserting federal antitrust claims not available to the State Law Plaintiffs who

were indirect purchasers of Cardizem CD. *See Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977).

Ultimately, State Law Plaintiffs filed 19 separate state law actions in 12 different states and the District of Columbia. In every case, Defendants removed the cases to the federal courts situated in the district where the state court actions were filed. In every instance, State Law Plaintiffs filed motions to remand the actions to the state courts in which they originated. Throughout late 1998 and early 1999, State Law Plaintiffs litigated issues of federal subject matter jurisdiction related to removal and remand in federal district courts throughout the United States. Prior to centralization of these cases in this Court by the Judicial Panel on Multidistrict Litigation ("JPML") in June 1999, federal district courts in California, the District of Columbia, Michigan, and Minnesota denied motions to remand. The District of Kansas granted a motion for remand in the case pending before it, and that case has proceeded on a parallel track with the actions before this Court under the supervision of Co–Lead Counsel. All other remand motions were heard by this Court after their transfer by the JPML.

All removed actions (except the remanded Kansas action and the Michigan action which had already been removed to this Court in 1998) were transferred to this Court by order of the JPML on June 11, 1999 or thereafter as tag-along cases. *In re Cardizem CD Antitrust Litig.*, 1999 U.S. Dist. LEXIS 9285 (J.P.M.L. June 11, 1999). In 2001, additional cases were commenced in this Court, one by the Litigating States (identified below) and another by the Individual Blue Cross Plaintiffs.[1] Ultimately, the Plaintiffs fell into five groups: (1) the consumers and third party payers who filed the joint motion for final approval of the Class Action Settlement (the "State Law Class Plaintiffs"); (2) the Litigating States, which have coordinated their prosecution and settlement with the State Law Class Plaintiffs, assumed lead representation of consumers as well as their states' agencies, and joined in the motion for final approval; (3) the direct purchasers, who settled in 2002 (the "Sherman Act Class Plaintiffs"); (4) the retail pharmacy chain store Plaintiffs which opted out of the Sherman Act Class and have settled with HMRI (now Aventis) but not Andrx (the "Sherman Act Individual Plaintiffs"); and (5) the Individual Blue Cross Plaintiffs.

In October 1999, this Court heard and determined all remand motions which had not previously been decided by the transferor courts. On October 14, 1999, this Court ordered two cases remanded to Florida state court on the grounds that there was no federal question subject matter jurisdiction, and denied the remand motions in cases emanating from six other states, holding that the Court had subject matter jurisdiction over these cases. *See In re Cardizem CD Antitrust Litig.*, 90 F.Supp.2d 819 (E.D.Mich. 1999). The two Florida actions have been prosecuted on a parallel track with the actions before this Court under the supervision of Co–Lead Counsel.

On October 22, 1999, Co–Lead Counsel for the State Law Plaintiffs filed a single coordinated pleading in which the allegations of all State Law Plaintiffs' actions before this Court were pleaded under a single Amended Coordinated Class Action Complaint. This coordinated pleading, and its subsequent amendments, enhanced the manageability of the prosecution and defense of the numerous separate actions.

In late 1999, Defendants separately moved for dismissal of all State Law Plaintiffs' complaints on the grounds that they failed to state a claim for relief for various reasons, on grounds of federal preemption, and on the grounds that the "Noerr–Pennington" doctrine was a complete defense to all claims. This Court, in Order No. 12, denied the Defendants' motions. *See In re Cardizem CD Antitrust Litig.*, 105 F.Supp.2d 618 (E.D.Mich.2000), *aff'd*, 332 F.3d 896 (6th Cir. 2003), *r'hrg and r'hrg en banc denied*, 2003 U.S.App. LEXIS 15575 (6th Cir. July 24, 2003). It determined numerous issues of law, including the limits of Noerr–Pennington immunity, the limited scope of preemp-

---

1. Blue Cross Blue Shield of Massachusetts, Blue Cross Blue Shield of Michigan, Blue Cross Blue Shield of Minnesota, and Excellus Health Plan, Inc. (the "Individual Blue Cross Plaintiffs").

tion doctrines, the meaning of the Sixth Circuit's "necessary predicate" standard for pleading antitrust injury, and the availability of various states' laws to indirect purchaser plaintiffs seeking damages caused by conduct alleged to be in violation of federal antitrust laws.

Contemporaneously with Defendants' motions to dismiss, Plaintiffs moved for a partial summary declaratory judgment holding that the September 1997 HMRI/Andrx Agreement was *per se* illegal under the antitrust and/or consumer protection laws of each of the states in which State Law Plaintiffs had asserted claims. This Court, in its Order No. 13, granted Plaintiffs' motion for partial summary judgment. *See In re Cardizem CD Antitrust Litig.,* 105 F.Supp.2d 682 (E.D.Mich.2000), *aff'd,* 332 F.3d 896 (6th Cir. 2003), *r'hrg and r'hrg en banc denied,* 2003 U.S.App. LEXIS 15575 (6th Cir. July 24, 2003). Defendants obtained leave from this Court to pursue interlocutory appeals of Orders No. 12 and 13 under 28 U.S.C. § 1292(b). *See* Order No. 16 (certifying for appeal two issues (1) an issue presented in Defendants' motions to dismiss concerning the proper interpretation of the Sixth Circuit's "necessary predicate" standard for pleading antitrust injury; and (2) the Court's *per se* ruling because this would affect discovery and trial). State Law Plaintiffs, as well as the other Plaintiffs in this multi-district litigation, and Defendants engaged in extensive briefing of the two appeals during 2001 and argued the appeals on April 30, 2002. These parties entered into a Settlement Agreement in January 2003, nine months after the appeals of Orders No. 12 and 13 were argued and five months before the appeals were decided. The parties indicate that they entered into the Settlement Agreement in an effort to mitigate their respective risks arising from these appeals. The Sixth Circuit's June 2003 decision affirming this Court's decisions does not alter any of the terms of the Settlement Agreement.

In Late 1999, State Law Plaintiffs also moved for class certification under the laws of the various states covered by the Coordinated Class Action Complaints. In 2000, the Court adopted State Law Plaintiffs' suggestion that the class certification motion and related discovery proceed on an exemplar basis using a proposed single state and the law of that single state. The State Law Plaintiffs proceeded with their motion to certify, on an exemplar basis, a class of consumers and third party payers who paid pharmacies in Michigan for Cardizem CD and/or its generic bioequivalents. After eleven months of discovery, including extensive expert discovery, and an evidentiary hearing in February 2001 at which the parties' respective experts testified, this Court granted in part and denied in part State Law Plaintiffs' motion. The Court held that certification of a class was appropriate under the Michigan Antitrust Reform Act for consumers and third party payers who would have paid less for Michigan prescriptions for branded Cardizem CD and generic bioequivalent versions of Cardizem CD (collectively "CD") if a generic had been introduced earlier. *See In re Cardizem CD Antitrust Litig.,* 200 F.R.D. 326 (E.D.Mich.2001). The Court also certified an "unjust enrichment" class of all consumers and third party payers who paid Michigan pharmacies for Cardizem CD. *Id.* at 351–52. Defendants unsuccessfully petitioned the Sixth Circuit for leave to appeal this decision pursuant to Fed.R.Civ.P. 23(f).

This Court considered other motions brought by State Law Plaintiffs, and granted in part Plaintiffs' motion for leave to amend their complaints so as to redefine the requirements for class membership for their antitrust and unjust enrichment classes, *see In re Cardizem CD Antitrust Litig.,* No. 99md1278, MDL No. 1278, 2000 WL 33180833, 2000–2 Trade Cas. (CCH) ¶ 73,112 (E.D.Mich. Sept. 21, 2000), and granted Plaintiffs' motion for leave to amend their Coordinated Class Action Complaints to make certain changes to conform their allegations to the evidence and to expand the class allegations to include consumers and third party payers who overpaid pharmacies for generic Cardizem CD manufactured by companies which were not Defendants (the so-called "umbrella damages" theory). (Orders No. 17 and 20.) Defendants moved to dismiss and/or strike various claims of Plaintiffs' Third Amended Complaint and claims

pleaded in the Litigating States' Complaint, including the umbrella damages allegations. These motions were briefed and argued, but will become moot if the Proposed Settlement is approved.

State Law Plaintiffs also moved to certify a nationwide unjust enrichment class consisting of all consumers and third party payers who paid retail pharmacies in the United States to fill prescriptions of Cardizem CD and generic bioequivalents of Cardizem CD, including generics not manufactured by Defendants. That motion is still pending, and it too will become moot if the Proposed Settlement is approved.

### B. State Attorneys General Enforcement Action

In the fall of 1999, while the State Law Plaintiffs' Class Action was pending, the New York Attorney General's office initiated an investigation into the circumstances under which generic versions of Cardizem CD were entering the market. (Pls.' Motion, 9/22/03 Novak Decl. ¶ 3.) The investigation arose from allegations that Defendants had entered into an anti-competitive agreement with respect to Cardizem CD and its bioequivalent generic alternatives. The investigation was subsequently joined in 2000 by additional investigating states, including Michigan, California, and Washington.

On May 14, 2001, New York, Michigan, Arizona, California, Idaho, Indiana, Maine, Minnesota, New Mexico, North Carolina, Oklahoma, Utah, Vermont, Washington, and West Virginia, by and through their Attorneys General, and the District of Columbia (collectively, "Litigating States"), filed a complaint against Defendants in this Court in their proprietary capacities on behalf of departments, bureaus, and agencies of state government as injured purchasers or reimbursers; and as *parens patriae* on behalf of natural persons in their collective States, and their respective States' quasi-sovereign inter-

ests in fair competition and the health of their citizenry, and/or in their sovereign capacities. The Litigating States asserted claims for monopolization, attempted monopolization, and agreements in restraint of trade in the market for Cardizem CD and its generic bioequivalents, in violation of federal and state antitrust and unfair competition or consumer protection laws. The Litigating States sought injunctive relief, civil penalties, damages, disgorgement, restitution, and other equitable relief.

In July 2001, the Litigating States filed an Amended Complaint which increased the number of Litigating States from sixteen to twenty-nine. A Second Amended Complaint was filed in September 2001, and in January 2003, the Attorneys General further amended their Complaint to include all states. (Pls.'s Motion, 9/22/03 Decl. of State Liaison Counsel Paul Novak (providing a detailed description of the litigation history of the State Attorneys General Enforcement Action).) The Plaintiff States' Third Amended Complaint was filed in January 2003 solely for purposes of this Proposed Settlement. It added Fed.R.Civ.P. 23 class certification allegations for certain Plaintiff States, and added the states of Alabama, Colorado, Delaware, Florida, Georgia, Illinois, Kentucky, Louisiana, Maryland, Massachusetts, Mississippi, Missouri, Montana, Nebraska, New Hampshire, New Jersey, Ohio, Oregon, Pennsylvania, South Dakota, Tennessee, Texas, and Virginia (collectively, "Joining States"), as joining states in the Settlement.[2]

After the Litigating States filed suit in this Court in May 2001, they assumed the lead representation of consumers in their respective states and jointly prosecuted the actions in cooperation with State Law Plaintiffs.

Contemporaneous with the intensive motion practice described above, the parties also engaged in extensive discovery. The State Law Plaintiffs and the Litigating States re-

---

**2.** "Litigating States" are Alaska, Arizona, Arkansas, California, Connecticut, the District of Columbia, Hawaii, Idaho, Indiana, Iowa, Kansas, Maine, Michigan, Minnesota, Nevada, New Mexico, New York, North Carolina, North Dakota, Oklahoma, Puerto Rico, Rhode Island, South Carolina, Utah, Vermont, Washington, West Virginia, Wisconsin, and Wyoming. The "Joining States" are Alabama, Colorado, Delaware, Florida, Georgia, Illinois, Kentucky, Louisiana, Maryland, Massachusetts, Mississippi, Missouri, Montana, Nebraska, New Hampshire, New Jersey, Ohio, Oregon, Pennsylvania, South Dakota, Tennessee, Texas, and Virginia.

viewed hundreds of boxes of Defendants' and third parties' documents (over one million pages were produced), reviewed over 50 statements taken under oath by the FTC, and took more than 25 oral depositions of witnesses, including senior executives of Defendants, market forecasters, and scientists. The Litigating States further coordinated data and document production efforts for over 120 separate governmental entities. (9/22/03 Novak Decl. ¶ 8.) Discovery disputes were brought to the Court for resolution by motion practice only after meet-and-confer sessions among the various parties' attorneys appointed by the Court to the Discovery Committee. (Order No. 6.) There were more than 30 meet-and-confer sessions of the Discovery Committee and at least 11 discovery-related motions.

## C. Mediation and Settlement

In early 2002, at the suggestion of the Court, all parties with cases before this Court agreed to participate in mediation in an effort to reach a settlement. Beginning in March 2002, and culminating in January 2003, counsel for State Law Plaintiffs and the Litigating States engaged in protracted negotiations with Defendants using the services of nationally-recognized mediator Eric Green. After numerous starts and stops and difficult negotiations over virtually every term of settlement, the parties reached agreement on the $80 million amount in late 2002, and the complex terms of the Settlement Agreement in January 2003. The Settlement Agreement was negotiated jointly by Co–Lead Counsel for State Law Plaintiffs and representatives of Michigan's and New York's Attorneys General, principally assisted by Assistant Attorneys General of California and Washington, acting on behalf of all of the Litigating States.

Contemporaneously, a separate intramural negotiation occurred over the allocation of the $80 million in the settlement fund among state agencies, consumers, and third party payers. State Attorneys' General negotiated for United States individual consumers and the states themselves. (9/22/03 Novak Decl.

¶ 12.) To negotiate for third-party payers, State Law Plaintiffs' Co–Lead Counsel used the services of in-house counsel at Aetna and Cobalt, together with an outside consultant, Mark D. Fischer, Chairman of Rawlings & Associates PLLC of Louisville, Kentucky, a law firm which is nationally known for its specialized practice representing health insurers, and the author of *The Rawlings & Associates National Subrogation Law Manual,* an annual comprehensive publication of research and analysis of every state's laws concerning health insurance subrogation and reimbursement claims. (9/22/03 Lowey Decl. ¶ 61; 9/18/03 Lawrence Decl. ¶ 11.) At Mr. Fischer's suggestion, State Law Plaintiffs also retained the services of Fred Curtiss, Ph.D., a pharmacist and economist specializing in managed care economics. Dr. Curtiss is the editor-in-chief of *The Journal of Managed Care Pharmacy,* and an expert in the emerging field of pharmacoeconomics. After extensive arm's length negotiations, including the exchange of data and discussions between the economists for the State Attorneys General and Dr. Curtiss, the allocation of net settlement proceeds reflected in Article III of the Settlement Agreement (55% to third-party payers and 45% to individual consumers) was agreed to by all parties.

A further final intramural allocation determination of how to allocate funds available to third-party payers based upon CD purchases in different states was reached by State Law Plaintiffs' counsel in consultation with Mr. Fischer. This resulted in a weighted ratio of 3:2 between claims for purchases which occurred in certain *"Illinois Brick* repealer" states that had been pled in the State Law Plaintiffs' complaints and purchases which occurred in other states. Similar allocation factors have been approved in other cases for third party payers. *See In re Lorazepam & Clorazepate Antitrust Litig.,* 205 F.R.D. 369 (D.D.C.2002).[3]

## D. The Settlement

### 1. The State Settlement Fund

Under the Settlement Agreement, the parties agreed that $7 million be set aside to pay

---

**3.** LDBS was lead counsel, and Cobalt was a class representative for the "United Wisconsin Class" of third party payers in that case and thus had experience with the issues of weighted allocation of settlement funds in state law indirect purchaser antitrust litigation.

states' designated governmental agency claims and in satisfaction of the states' potential remedies and civil penalties. Subject to this Court's approval, the State Settlement Fund will be used to pay the legal fees and costs of the Litigating States in an amount not to exceed $2,500,000. (Settlement Agreement ¶ I.PP.)

### 2. The Consumer Distribution Plan

Forty-five percent (45%) of the "Net Settlement Fund" will be allocated to pay the claims of consumer members of the Class. (*Id.* Article III.F.1.) The Net Settlement Fund will equal the Aggregate Settlement Fund less (1) the State Settlement Fund, (2) attorneys' fees and expenses, and other amounts awarded by the Court to State Law Plaintiffs and their counsel, (3) Court-approved costs of notice, and (4) settlement administration fees and costs. If the Court approves all fees and expenses applied for in their full amount, the net amount available for distribution to consumer class members will be approximately $25 million, less any costs incurred for consumer claims administration.

### 3. The Third Party Payer Distribution Plan

Fifty-five percent (55%) of the Net Settlement Fund will be allocated to pay the claims of Third Party Payer Class members ("TPP") and TPP settlement administration costs. (*Id.* Article III.F.2.) If the Court approves all fees and expenses applied for, the net amount available for distribution to third party payer class members will be approximately $30 million.[4]

The Settlement Agreement's settlement reduction and "blow provision" termination contingency clauses (*Id.* Articles IV.A and

X.A.4) were not triggered due to the paucity of opt-outs and are therefore now irrelevant.[5] The Settlement Agreement also provides for a specific and general release of all claims relating to the allegations in this lawsuit. This release will operate to terminate this litigation once the Settlement Agreement becomes effective as defined in that Agreement. (*Id.* Article I.CC.; Article I.N.)

### E. Preliminary Approval of Proposed Settlement

On January 29, 2003, this Court issued Order No. 59, preliminarily approving the Proposed Settlement. Also, for purposes of the Settlement and Settlement Agreement only and pending final approval of the Proposed Settlement, the Court conditionally certified a Settlement Class consisting of:

All consumers and Third Party Payers (including any assignees of such consumers or Third Party Payers) who purchased and/or paid all or part of the purchase price of Cardizem CD Products dispensed pursuant to prescriptions in the United States (including Puerto Rico) during the period January 1, 1998, through the date of this Preliminary Approval Order and all Designated Governmental Agencies. Excluded from the Settlement Class are Defendants and any of their officers and directors. Included in the Settlement Class are any and all members of any class or classes asserted in any State Action.

(Order No. 59 ¶ 5.) The Court preliminarily found that the proposed Settlement Class met all the applicable requirements of Fed. R.Civ.P. 23. (*Id.* ¶ 6.)

The Court also preliminarily approved Aetna, Inc., Cobalt Corporation, and Charles Zuccarini as class representatives. In addition to any *parens patriae* or functionally

---

4. Included in the $30 million estimate is whatever share of the third party payers' allocable share of the net settlement that would have been payable to the Individual Blue Cross Plaintiffs if they had not opted out of the settlement class. (Settlement Agreement, Article I.V. and Article IV.A.1.) That amount will be paid to Defendants. Defendants may or may not use all or any portion of that reverter to settle the claims of the Individual Blue Cross Plaintiffs.

5. The Settlement Agreement, at Article X, sets forth certain other conditions under which the Settlement Agreement may terminate. In the event of termination, the parties shall be returned to the *status quo ante* and settlement funds paid, less certain amounts dedicated to the costs of class notice, shall be returned to Defendants in proportion to their respective contributions. A principal condition remaining at this time is judicial approval of the settlement. (Settlement Agreement, Article X.C., D.)

equivalent authority that any of the Attorneys General of the Plaintiff States may have under state law, the Court further preliminarily approved the Attorneys General of Alaska, Alabama, Arkansas, California, Connecticut, Georgia, Indiana, Iowa, Kansas, Kentucky, Maine, Massachusetts, Montana, Nebraska, Nevada, North Carolina, Oklahoma, South Carolina, Utah, Wisconsin, and Wyoming as additional class representatives (collectively, with Aetna, Inc., Cobalt Corporation, and Charles Zuccarini, the "Class Representatives") on behalf of natural person members of the Settlement Class residing in their respective states. (*Id.* ¶ 7.)

Finally, Order No. 59 set October 1, 2003, as the date for the hearing seeking final approval of the Proposed Settlement ("Fairness Hearing"). (*Id.* ¶ 19.)

A fairness hearing was held on October 1, 2003, and this Court now determines whether final approval of the Proposed Settlement and Plan of Allocation should be granted. First, the Court considers Plaintiffs' request that the conditionally certified settlement class now be unconditionally certified.

## II. Analysis

### A. Class Certification for Purposes of Settlement

In its Order preliminarily approving the Proposed Settlement, the Court conditionally certified the Settlement Class, defined in the Settlement Agreement as:

All consumers and Third Party Payers (including any assignees of such consumers or Third Party Payers) who purchased and/or paid all or part of the purchase price of Cardizem CD Products dispensed pursuant to prescriptions in the United States during the period January 1, 1998 through the date of the Preliminary Approval Order and all Designated Governmental Agencies. Excluded from the Class are Defendants and any of their officers and directors. Included in the Settlement Class are any and all members of any class or classes asserted in any of the State Actions.

Order No. 59 at ¶ 5. The Court also preliminarily approved Plaintiffs Aetna, Inc. ("Aet-

na"), Cobalt Corporation ("Cobalt"), and Charles Zuccarini as class representatives ("State Law Plaintiffs"). *Id.* at ¶ 6. Plaintiffs now request that the Court unconditionally certify this class for settlement purposes under Fed.R.Civ.P. 23.

■ Under Fed.R.Civ.P. 23, the Court must engage in a two-step analysis to determine whether to certify this as a class action for settlement purposes. First, the Court must determine whether Plaintiffs have satisfied the prerequisites for maintaining a class action under Rule 23(a). Then, under Rule 23(b), the Court must determine whether there are additional elements that would justify the class certification. *See* Fed.R.Civ.P. 23(a), Advisory Committee's Note, 1966 Amendment, Subdivision (a). "Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems, *see* Fed. Rule Civ. Proc. 23(b)(3)(D), for the proposal is that there be no trial." *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 619, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997).

Applying this two-step analysis, this Court certifies the proposed class for settlement purposes.

### 1. The Requirements of Rule 23(a) Are Satisfied

Rule 23(a) provides that class members may maintain a class action as representatives of a class if they satisfy four prerequisites:

(a) the class members are so numerous that joinder of all members is impracticable;

(b) the action addresses questions of law or fact common to the class;

(c) the claims or defenses of the class representatives are typical of the claims or defenses of the class; and

(d) the class representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a).

This Court has already determined that the class certification prerequisites were suf-

ficiently demonstrated by State Law Plaintiffs in April 2001 when it certified an exemplar class for certain consumers and third party payers with Cardizem CD purchases in the state of Michigan. *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 326, 334–51 (E.D.Mich.2001). Class representatives here, Mr. Zuccarini, Aetna, and Cobalt, have similarly satisfied each of the prerequisites necessary to certify a nationwide class action for settlement purposes.

### a. The Settlement Class is Sufficiently Numerous—Rule 23(a)(1)

■ This Court has previously determined the numerosity prerequisite has been satisfied, relying on public data that identified over 13 million prescriptions for Cardizem CD filled in the United States in 1998. *Id.* at 335. Over 1,819 third party payers and 37,-387 consumers have already filed proofs of claim, claiming entitlement to share in the distribution of the Settlement Fund as Class members. (Pls.' Motion, 9/19/03 Glenn Aff. ¶ 10; 9/19/03 Potter Aff.) Joinder is clearly impractical. *See In re Lorazepam & Clorazepate Antitrust Litig.*, 205 F.R.D. at 401.

### b. There Are Questions of Law and Fact Common to the Class—Rule 23(a)(2)

■ The second criterion under Rule 23(a) is commonality. Commonality requires that "there be questions of law or fact common to the class." Fed.R.Civ.P. 23(a)(2). It is not required that all questions of law and fact be common. The "existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir.1998). In this case, the commonality criterion is satisfied because all of the State Law Plaintiffs' claims derive from the same set of salient facts. Even if the members of the proposed class possess different avenues of redress, "their claims stem from the same source." *Id.*

The commonality prerequisite of Rule 23(a)(2) is met for all members of the Settlement Class as every class member's claim is that his or her or its respective state's laws prohibit Defendants' conduct as alleged in State Law Plaintiffs' Third Amended Coordinated Class Action Complaints ("the Complaints") and provides rights of recovery to persons injured by such conduct. Indeed, the Complaints, which cover the claims of Plaintiffs who or which filed complaints in numerous state courts all share the same verbatim allegations of fact, *see* the Complaints, and virtually identical claims of unjust enrichment and substantially similar claims under their respective states' trade practices acts. Each Class member (consumers, state agencies, and third party payers alike) has a common interest in establishing that he, she, or it was financially injured by Defendants' conduct and in an aggregate damages computation. *See In re Cardizem CD Antitrust Litig.*, 200 F.R.D. at 335. Class members' differing damages do not impair the commonality of their claims. *See Desiano v. Warner–Lambert*, 326 F.3d 339, 350 (2d Cir.2003) (observing that the "[p]laintiffs' suit raises no apportionment difficulties because each [health benefit provider] and its patient co-payer has its own, segregable, claim for economic harm, to the extent of their respective co-pay").

### c. The Claims of Class Representatives Aetna, Cobalt, and Mr. Zuccarini Are Typical of Those of the Class—Rule 23(a)(3)

■ Aetna one of the largest managed care companies in the United States, and Mr. Zuccarini, a Michigan consumer, have already been found by this Court in Order No. 25 to be both typical of end payer class members and adequate representatives for a Michigan class. *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. at 337. The same analysis applies to Aetna's, Cobalt's, and Mr. Zuccarini's participation as class representatives for the proposed Settlement Class. Aetna provides health payment benefits to over 23 million people and has agreements with over 46,000 participating pharmacies in the United States, covering every state and territory in the United States and the District of Columbia. (Third Am. Compl. ¶ 9(g)(2); 9/19/03 Lawrence Decl. ¶ 2 (citing slightly lower numbers due to member attri-

tion).) As such, Aetna's claims for relief are typical of the claims of every Class member in every state who claims he, she, or it overpaid at the pharmacy for Cardizem CD or its generic equivalents. Moreover, as a consumer and third party payer, Mr. Zuccarini and Cobalt each seek to recover for the inflated prices they paid for Cardizem CD and its generic bioequivalents and to disgorge the amounts received by Defendants as a result of their conduct. Both claims are typical of all United States consumers and third party payers. *See In re Lorazepam & Clorazepate Antitrust Litig.*, 205 F.R.D. at 369, 387, 401 (observing that "the state agencies' and consumers' claims are typical because they arose at the same time in the same market and are based on the same theory of damages", "the [third party payer's claims] are typical of their respective class members in that they allege illegal combination, conspiracy, or agreement by the defendants which resulted in anticompetitive injuries").

#### d. Aetna, Cobalt, and Mr. Zuccarini Have Adequately Represented the Class—Rule 23(a)(4)

■ Aetna, Cobalt, and Mr. Zuccarini have been prosecuting this case vigorously since 1998 and 1999, and this Court has determined that Aetna, Mr. Zuccarini, and its counsel are adequate to prosecute the Michigan antitrust claims. The same result applies to the class representatives' ability to prosecute claims under the laws of other states. *See In re Lorazepam & Clorazepate Antitrust Litig.*, 205 F.R.D. at 401 (finding Cobalt, then known as "United Wisconsin Services Corporation," adequate to represent multi-state third party payer class); *In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231, 250–51 (D.Del.2002) (finding named consumers and third party payers, including Cobalt, adequate class representatives whose claims were typical in nationwide settlement of claims of prescription drug overcharges). The State Attorneys General and private counsel involved in this litigation are experienced antitrust litigators who have adequately represented the interests of the Settlement Class. Unlike the settlement under review in *Amchem*, 521 U.S. at 601–02,

117 S.Ct. 2231, this settlement was not a "pre-packaged" deal arranged before litigation began and without any intent by the parties to ever litigate the claims. On the contrary, as the docket reveals, State Law Plaintiffs and their counsel have labored for years litigating these claims and attempting to convince Defendants of the need to resolve their legitimate claims.

#### 2. The Requirements of Rule 23(b)(3) Are Satisfied—Questions of Law and Fact Common to the Class Predominate

■ Fed.R.Civ.P. 23(b)(3) provides that a court can certify an action as a class action if the "court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." This Court has previously concluded that common questions predominate over individual ones in the proof of the State Law Plaintiffs' claimed injuries and damages, and that in the case of the exemplar Michigan class, maintenance of a class action was superior to other available methods to fairly and efficiently adjudicate this controversy. *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. at 351. The same logic applies here to claims of the other members of the class. Judicial economy as well as fairness to the parties makes settlement of these claims in one action far more desirable than litigation of numerous separate actions litigating similar issues. *See In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. at 243–51 (finding predominance in similar nationwide settlement class of all United States consumers and third party payers of the prescription drug Coumadin).

#### 3. Conclusion

State Law Plaintiffs have satisfied all of the requirements under Rule 23. Accordingly, this Court certifies the proposed class for settlement purposes.

## B. Final Approval of Class Action Settlement

State Law Plaintiffs and the certified State Law Plaintiff Class, and their counsel, together with the Attorneys General of both the "Litigating States" and the "Joining States" (collectively "Plaintiff States") request that this Court grant final approval, pursuant to Federal Rule of Civil Procedure 23(e) and the corresponding authority of Plaintiff States [6], to the compromise by settlement of the above-captioned coordinated class action cases in accordance with the terms of the "Settlement Agreement By and Among Plaintiff States, State Law Plaintiffs, Aventis, Carderm Capital and Andrx" dated January 24, 2003 (the "Settlement Agreement"). The terms of settlement embodied in the Settlement Agreement are referenced herein as the "Proposed Settlement."

The Settlement Agreement was preliminarily approved by this Court in Order No. 59 on January 29, 2003. The Notice program approved by the Court has now been completed. (9/19/03 Aff. of Thomas R. Glenn, Vice President of Operations of Complete Claims Solutions, the settlement administrator for third party payer class members; 9/18/03 Aff. of Matthew B. Potter, Rust Consulting, Inc.; 9/19/03 Aff. of Andrew Novak of Kinsella Communications, Inc.)

The Settlement Class consists of consumers and third party payers who or which paid, in whole or in part, for prescriptions of branded Cardizem CD and generic bioequivalent versions of Cardizem CD (collectively, "CD") filled in the United States between January 1, 1998 and January 29, 2003 (the "Class Period"). Class members and the Plaintiff States will share in a gross settlement fund of $80,000,000, plus interest from January 2003,[7] pursuant to the allocation pro-

visions of Article III of the Settlement Agreement and the Government Compensation Plan, Consumer Distribution Plan and Third Party Payer Distribution Plan, which are Exhibits D, E, and F, respectively, to the Settlement Agreement.

The Settlement Agreement, if approved, will conclude more than five years of investigation, litigation, state enforcement, and settlement-related proceedings. Among third party payer class members, comprised of hundreds of commercially sophisticated managed care companies, hundreds of union health and welfare benefit plans and thousands of self-funded health benefit plans, more than 1,800 proofs of claim were filed. The only objection filed by a third party payer, Health Care Services Corporation, was withdrawn after the October 1, 2003, fairness hearing, and there are only a handful of opt-outs (primarily the four health insurers which have been litigating their claims separately from the class since 2001).[8] Two of the class representatives, Aetna and Cobalt, are large health insurers with experience as class representatives in prescription drug overcharge litigation.[9] The response by third party payers indicates knowledgeable class members' overwhelming approval of the Settlement. Also, there were a negligible number of consumer opt-outs and only two consumer objections.

Before deciding whether to grant final approval of the Proposed Settlement, this Court discusses the State Attorneys' General authority to settle their respective consumer citizens' claims.

### 1. State Attorneys' General Authority to Settle All Consumer Claims

■ Plaintiff States, by their Attorneys General, have the authority to settle and

---

6. 15 U.S.C. § 15c(c) requires court approval of settlements of *parens patriae* claims asserted by state attorneys general under 15 U.S.C. § 15c(a). Plaintiff States seek court approval of similar claims asserted on behalf of consumers by States pursuant to authority specified below in § B.1. Plaintiff States seek court approval of all aspects of the settlement, including settlement of state proprietary claims.

7. Through September 11, 2003, accrued interest totaled $454,292.97.

8. Blue Cross Blue Shield of Massachusetts, Blue Cross Blue Shield of Michigan, Blue Cross Blue Shield of Minnesota, and Excellus Health Plan, Inc. (the "Individual Blue Cross Plaintiffs").

9. *See In re Synthroid Marketing Litig.*, 188 F.R.D. 287 (N.D.Ill.1999) (Aetna as class representative), and *In re Lorazepam & Clorazepate Antitrust Litig.*, 205 F.R.D. 369 (D.D.C.2002) (Cobalt as class representative). *See also* 9/19/03 Lawrence Decl., 9/19/03 Bartlett Decl., and 9/19/03 Nash Decl.

release indirect purchaser claims in a *parens patriae* or other representative capacity. In *Alfred L. Snapp & Son, Inc. v. Puerto Rico,* 458 U.S. 592, 607, 102 S.Ct. 3260, 73 L.Ed.2d 995 (1982), the United States Supreme Court observed that "a State has a quasi-sovereign interest in the health and well being—both physical and economic—of its residents in general." That federal authority is supplemented by state statutory provisions and case law. The developing state law establishing the State Attorneys' General authority to represent consumers can be divided into four categories: (1) *parens patriae* authority expressly conferred by the state legislature, (2) authority expressly conferred by the state legislature that is the functional equivalent of *parens patriae* authority, (3) judicially recognized authority to represent consumers, or (4) authority to proceed as a class representative of consumers pursuant to Fed.R.Civ.P. 23. *See In re Lorazepam & Clorazepate Antitrust Litig. ("Lorazepam"),* 205 F.R.D. at 386–87. In that case, the United States District Court for the District of Columbia found that each of the State Attorneys General had authority to represent consumers and to settle and release their claims. *Id.* at 386. Specifically, the *Lorazepam* Court found that:

> *Fourteen* of these *states*—California, Colorado, Delaware, the District of Columbia, Hawaii, Idaho, Massachusetts, Nevada, Ohio, Oregon, Rhode Island, South Dakota, Utah, and West Virginia—have expressly conferred *parens patriae* authority. *Sixteen* *states*—Alaska, Arizona, Florida, Illinois, Kansas, Maryland, Mississippi, New Hampshire, New York, North Carolina, North Dakota, Pennsylvania, Vermont, Virginia, Wisconsin, and Wyoming—have express statutory authority to represent consumers in a capacity which is the functional equivalent of *parens patriae*. *Thirteen states*—Alabama, Kentucky, Louisiana, Maine, Michigan, Minnesota, Missouri, Montana, New Jersey, New Mexico, Tennessee, Texas, and Washington—have had state and/or federal courts interpret statutory provisions to effectively grant *parens patriae* authority or have determined that their attorney general has such authority under state

> common law.... *[E]ight states*—Arkansas, Connecticut, Georgia, Indiana, Iowa, Nebraska, Oklahoma, and South Carolina—... represent their respective citizen-consumers pursuant only to Federal Rule of Civil Procedure 23.

*Id.* at 386–87 (citations omitted) (emphasis added).

Because this area of law continues to develop, there are a few changes to the placement of states in the various categories used by the *Lorazepam* Court. The revised placement of states is as follows:

Thirteen states and the Commonwealth of Puerto Rico—California, Colorado, Delaware, the District of Columbia, Hawaii, Idaho, Nevada, Ohio, Oregon, Puerto Rico, Rhode Island, South Dakota, Utah, and West Virginia—have expressly conferred *parens patriae* authority upon their Attorneys General. *See id.* *See also* P.R. Laws Ann. tit. 32, §§ 3341–3344. (Pls.' Motion, Ex. A.)

Seventeen states—Alaska, Arizona, Florida, Illinois, Iowa, Kansas, Maryland, Mississippi, New Hampshire, New York, North Carolina, North Dakota, Pennsylvania, Vermont, Virginia, Wisconsin, and Wyoming—have express state statutory authority to represent consumers in a capacity that is the functional equivalent of *parens patriae* authority. *See Lorazepam,* 205 F.R.D. at 386–87. *See also* Fla. Stat. Ann. § 501.207; Iowa Code § 714.16(7); N.Y. Exec. Law § 63(1) (McKinney's 1994), N.Y. Gen. Bus. Law §§ 340, 342 (McKinney's 1999) and N.Y. Gen. Bus. Law § 349 (McKinney's 1988). (Pls.' Motion, Ex. A.)

Fifteen states—Alabama, Arkansas, Kentucky, Louisiana, Maine, Michigan, Minnesota, Missouri, Montana, New Jersey, New Mexico, South Carolina, Tennessee, Texas, and Washington—have had state and/or federal courts either interpret statutory provisions to grant effectively *parens patriae* authority to the Attorney General, or determine that the particular State Attorney General possesses *parens patriae* authority, or its functional equivalent, as a matter of state common law (or civil law in the case of Louisiana). *See Lorazepam,* 205 F.R.D. at 386–87. *See also State v. Snow,* 230

Ark. 746, 324 S.W.2d 532, 534 (1959); *Commonwealth ex rel Chandler v. Anthem Ins. Cos.*, 8 S.W.3d 48, 55 (Ky.Ct.App.1999); *In re Certified Question*, 465 Mich. 537, 638 N.W.2d 409 (2002); S.C.Code Ann. §§ 39–5–10, *et seq., State ex rel Condon v. Hodges*, 349 S.C. 232, 562 S.E.2d 623 (S.C.2002); Tenn.Code Ann. § 8–6–109(b)(1), *Sage v. Appalachian Oil Co.*, Nos. 92–CV–716, 2:93–CV–229, 1994 WL 637443, 1994–2 Trade Cas. (CCH) ¶ 70,745 (E.D.Tenn. Sept.7, 1994); Wash. Rev.Code § 19.86, *Blewett v. Abbott Labs.*, 86 Wash.App. 782, 938 P.2d 842 (1997). (Pls.' Motion, Ex. A.)

Six State Attorneys General—Connecticut, Georgia, Indiana, Massachusetts, Nebraska, and Oklahoma—represent their consumer-citizens' claims solely in a representative capacity pursuant to Fed.R.Civ.P. 23.[10]

Having determined that the State Attorneys General have authority to settle consumer claims, the Court now considers whether it should grant final approval to the Proposed Settlement.

## 2. Standards for Court Approval of Settlement

In deciding whether to grant final approval of the Proposed Settlement[11], this Court must determine, after holding a fairness hearing, whether the settlement is "fair, adequate, and reasonable, as well as consistent with the public interest." *Bailey v. Great Lakes Canning, Inc.*, 908 F.2d 38, 42 (6th Cir.1990). The Court's determination also requires consideration of "whether the interests of the class as a whole are better served if the litigation is resolved by the settlement rather than pursued." *Manual for Complex Litigation (Third)* § 30.42 at 238 (1995).

■ Relevant factors considered by the Court include: (a) the likelihood of success

on the merits weighed against the amount and form of the relief offered in the settlement; (b) the risks, expense, and delay of further litigation; (c) the judgment of experienced counsel who have competently evaluated the strength of their proofs; (d) the amount of discovery completed and the character of the evidence uncovered; (e) whether the settlement is fair to the unnamed class members; (f) objections raised by class members; (g) whether the settlement is the product of arm's length negotiations as opposed to collusive bargaining; and (h) whether the settlement is consistent with the public interest. *See Granada Invs., Inc. v. DWG Corp.*, 962 F.2d 1203, 1205 (6th Cir.1992); *Williams v. Vukovich*, 720 F.2d 909, 922–23 (6th Cir.1983); *Kogan v. AIMCO Fox Chase, L.P.*, 193 F.R.D. 496, 501–02 (E.D.Mich. 2000); *Steiner v. Fruehauf Corp.*, 121 F.R.D. 304, 305–06 (E.D.Mich.1988).

## 3. Evaluation of the Settlement Under Applicable Standards

■ Evaluated under the applicable standards, this Court finds that the Settlement is a fair, adequate, and reasonable resolution of these very complex cases.

## a. The Likelihood of Success on the Merits Weighed Against the Amount and Form of the Relief Offered in the Settlement Favors Approval

Pursuant to the Proposed Settlement, Class members will obtain the immediate and certain benefit of cash. The gross cash settlement of $80 million under the Proposed Settlement represents more than eighty-five (85%) percent of the total amount which the Litigating States' expert economist has estimated all United States end-payers were overcharged. (Pls.' Motion, 9/19/03 Rausser

---

10. The Attorneys General of Alaska, Arkansas, California, Iowa, Kansas, Kentucky, Louisiana, Mississippi, Montana, Nevada, North Carolina, North Dakota, Ohio, Rhode Island, South Carolina, South Dakota, Texas, Utah, Virginia, Wisconsin, and Wyoming assert claims on behalf of their consumer residents primarily pursuant to their respective state's *parens patriae* or similar authority and secondarily as a class representative of consumer residents pursuant to Fed. R.Civ.P. 23.

11. *Parens patriae* settlements entered into by state Attorneys General are analyzed under a standard and procedure similar to that used to consider private class action settlements under Fed.R.Civ.P. 23. *See New York v. Reebok Int'l, Ltd.*, 903 F.Supp. 532, 533 (S.D.N.Y.1995), *aff'd*, 96 F.3d 44 (2d Cir.1996).

Aff.) [12] The recovery to the Class under the negotiated Proposed Settlement is well within the range of reasonableness in relation to claimed damages. *See e.g., In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. at 258 (observing that "[t]he settlement amount of $44.5 million represents more than 33% of the maximum possible recovery," and finding that this is "a very reasonable settlement when compared with recovery percentages in other class actions."). Moreover, the $80 million settlement amount is more than 70% of the amount paid to settle the direct purchaser class claims. In light of the enormously greater prosecution hurdles facing indirect purchasers, the State Law Plaintiffs' and State Attorneys' General settlement compares quite favorably.

Of course, before recovering damages on any scale, Plaintiffs would first have to succeed in proving liability, an all-or-nothing proposition. The risks of continued litigation are discussed next.

**b. The Risks, Expenses, and Delay of Continued Litigation Favor Approval**

Settlements should represent "a compromise which has been reached after the risks, expense and delay of further litigation have been assessed." *Williams*, 720 F.2d at 922.

Accordingly, this Court examines the risks, expense, and delay Plaintiffs would face if they continued to prosecute this complex litigation through trial and appeal and weighs those factors against the amount of recovery provided to the Class in the Proposed Settlement.

This Court has previously observed that "[t]he prospect of a trial necessarily involves the risk that Plaintiffs would obtain little or no recovery." Order No. 49 at 7. Likewise, this Court and the Sixth Circuit have clarified that a *per se* ruling still leaves for a later time "all issues of causation, injury and damages." *In re Cardizem CD Antitrust Litig.*, 105 F.Supp.2d at 692, 332 F.3d at 909. Experience proves that, no matter how confident trial counsel may be, they cannot predict with 100% accuracy a jury's favorable verdict, particularly in complex antitrust litigation. *See e.g., In re Brand Name Prescription Drugs Antitrust Litig.*, No. 94 C 897, MDL 997, 1999 WL 33889, 1999–1 U.S. Trade Cas. (CCH) ¶ 72,446 (N.D.Ill.), *aff'd in part, vacated in part*, 186 F.3d 781, 785 (7th Cir.1999) (plaintiff class suffered directed verdict after eight weeks of trial); *United States Football League v. Nat'l Football League*, 644 F.Supp. 1040 (S.D.N.Y.1986) (antitrust jury awarded $1.00 in nominal damages to successful plaintiffs), *aff'd*, 842

12. Dr. Rausser computed nationwide end-payer damages attributable to an assumed eleven-month delay of the entry of generic versions of Cardizem CD. Plaintiffs claim that damages continued to accrue after generic competition began because CD prices continued to be higher than they would have been but for the delay of generic competition. Plaintiffs also claim that damages should be measured until the date in the future when the prices of CD are the same as they would have been without any delay of generic competition. Defendants contended, without conceding any liability, that if they were liable, the liability would have terminated when the Cardizem CD monopoly ended, or, alternatively, when Andrx's 180–day exclusivity period terminated. Dr. Rausser's analysis conservatively assumes that this date would occur 2.5 years after Andrx's generic entry. (9/19/03 Rausser Aff. ¶ 6.) The damages period was certain to be a fiercely contested issue on summary judgment and/or trial. However, even with a longer damages period, the settlement amount represents a substantial recovery.

For use in settlement negotiations, State Law Plaintiffs had expert economist, Cornerstone Re-

search, Inc., prepare a damages analysis on a national basis and on a state-by-state basis. In those negotiations, State Law Plaintiffs disclosed to Defendants certain summary results of Cornerstone's analysis, among the results disclosed was Cornerstone's conclusion that, for the period July 1998 through a projected market equilibrium date in 2003, national aggregate single damages for consumer and third party payer class members in the 19 states under whose laws State Law Plaintiffs had asserted antitrust-related claims were in a range with a low end of $67 million. Assuming all United States consumers and third party payers had valid state law damages antitrust-related claims, Cornerstone estimated that aggregate damages for the four and one-half year damage period would be in a range with a low end of $150 million. (9/22/03 Lowey Decl. ¶ 41.) These damages estimates were based on certain assumptions of fact that were hotly contested by Defendants and on which Plaintiffs would bear the burden of proof at trial. Mindful of these facts, the settlement amount compares favorably with the Cornerstone damages' estimates and represents a substantial recovery.

F.2d 1335 (2d Cir.1988). In addition to these general litigation risks, Plaintiffs faced specific litigation hurdles that would have to be overcome for successful prosecution at trial and on appeal.

Plaintiffs faced significant risks regarding the causation element of their claims. This was an "all or nothing" issue in this case. Part of this risk arose from a statement the FTC made in connection with the resolution of its administrative proceeding against HMRI and Andrx, which began in March 2000.

The FTC prosecuted its administrative complaint separate and apart from the actions before this Court; and, on the eve of trial, the FTC dismissed its case and entered into a consent agreement with HMRI and Andrx on April 2, 2001. The FTC also issued an "Analysis to Aid Public Comment," stating that, based on its investigation, it did not believe that Defendants' September 1997 Agreement delayed the introduction of Andrx's generic version of Cardizem CD. While Plaintiffs disagree with the FTC and believe the statement has no precedential value, it highlights one of the primary risks Plaintiffs would face absent the Proposed Settlement. If found admissible, the statement would have certainly had a negative impact on Plaintiffs' cases. This statement weakened the Plaintiffs' settlement position and justified moderation of their demand, notwithstanding the letter of clarification Plaintiffs' received from FTC staff. (4/20/01 Ltr. to Pls. from Richard Feinstein, Asst. Director, Bureau of Competition, FTC.)

During the course of this litigation, Defendants have vigorously challenged Plaintiffs' claims with multi-faceted and complex causation arguments; i.e., that, regardless of the September 1997 HMRI/Andrx Agreement, Andrx had no intention of coming to market while its patent litigation with HMRI was pending, and furthermore, Andrx could not have come to market any earlier due to various financial and technical reasons. While Plaintiffs' counsel believe they have persuasive circumstantial evidence to refute these defenses (which helped them to obtain a favorable settlement), they could not ignore the risk that Plaintiffs could lose their entire case on this issue at trial.

Plaintiffs would also have faced other additional potentially dispositive defenses at trial. Had the parties proceeded to trial, the assumptions underlining Dr. Rausser's damages estimate would have been the subject of serious dispute between the parties. Most notably, Defendants would have argued that, for various supply logistics, manufacturing, and FDA approval reasons, generic manufacturers (including Andrx) did not possess the capability to come to market any sooner than they actually did. As a result, Defendants would have argued that Dr. Rausser's $93.7 million damage estimate vastly overstates the actual damages since such damages are predicated upon the assumption that the September 1997 HRMI/Andrx Agreement caused the Introduction of generic CD to be delayed for eleven months. As Dr. Rausser indicates, to the extent Defendants successfully established that any of the generic manufacturers were unable to market their lower cost generic versions of Cardizem CD at any point in time during that eleven month period, the damages figure would decrease accordingly. (9/19/03 Rausser Aff. ¶ 4.)

Plaintiffs faced a significant risk that they would be unable to persuade a jury of Andrx's ability or willingness to market a generic version of Cardizem CD at any point in time prior to the date it first sold generic Cardizem CD in June 1999. Andrx asserts that, at the time of the September 1997 Agreement, it was a relatively young company with limited capital, little experience in launching generic products, and unproven manufacturing capabilities. Andrx also claims that it was experiencing difficulty achieving the dissolution rates specified in its generic Cardizem CD ANDA. According to Andrx, raw material problems, particularly in calibrating the spray rate of the machines that coated the capsules with a permeable polymer, plagued the company throughout the alleged "but-for" period preceding the launch of generic Cardizem CD in June 1999. Plaintiffs carefully analyzed the evidence of these manufacturing obstacles and consulted with a drug development expert to evaluate the strengths and weaknesses of Andrx's po-

sition. The defense would be a significant focus of any trial of these cases and could result in no award at trial.

The parties were also cognizant, during the negotiations, that Defendants had attacked Plaintiffs' legal ability to obtain indirect purchaser recovery under various states' laws. These issues were extensively briefed by the parties and only partially resolved when the parties entered into the Settlement Agreement. Although Plaintiffs were confident of their position on this issue, the issue was not without legal risk.

Furthermore, State Law Plaintiffs faced a daunting task of obtaining certification of multiple states' classes over Defendants' intense opposition. At the time of settlement, class certification had not been granted in states other than Michigan, and Defendants had informed the Court that they intended to move to de-certify the Michigan class.

Finally, continued prosecution through trial and appeal would have caused substantial additional expenses and delay. Although significant discovery has already taken place, substantial additional effort and expense would be required to prepare this matter for trial. This would include (1) completion of fact and expert discovery, (2) preparing witnesses, experts, and exhibits, and (3) completion of pre-trial motion practice, including probable motions for summary judgment.

In light of the above, this Court finds that the certain and immediate benefits to the Class represented by the Settlement outweigh the possibility of obtaining a better result at trial, particularly when factoring in the additional expense and long delay inherent in prosecuting this complex litigation through trial and appeal.

**c-d. The Judgment of Experienced Counsel and the Amount and Character of Discovery Weigh in Favor of Approval**

 In approving a proposed settlement, the Court also considers the opinion of experienced counsel as to the merits of the settlement. As the Sixth Circuit observed, "[t]he court should defer to the judgment of experienced counsel who has competently evaluated the strength of his proofs. Significantly, however, the deference afforded counsel should correspond to the amount of discovery completed and the character of the evidence uncovered." *Williams,* 720 F.2d at 922–23 (internal citations omitted). *Accord, Manual for Complex Litigation (Third)* § 30.42 at 240 (1995).

Unlike many class action settlements negotiated solely by private sector lawyers without the involvement of the class representatives, the settlement in this case was negotiated and approved by highly sophisticated representatives of the Plaintiff Class. In-house counsel for Aetna and Cobalt, who took a hands-on role throughout the five-year history of this litigation, participated in negotiations and reviewed and approved the settlement and allocations. (9/18/03 Lawrence Decl. ¶¶ 6, 11; 9/19/03 Nash Decl. ¶ 8.)

The Court may also rely upon the participation of State Attorneys General as a factor in favor of the fairness and adequacy of the Settlement. This case was jointly litigated by the twenty-nine Litigating States in conjunction with the State Law Plaintiffs and all States' Attorneys General who subsequently joined the Settlement. As the chief law enforcement officers in their respective states, the State Attorneys General are expressly empowered to enforce their state antitrust and consumer protection laws and to obtain damages for consumers in their states. That Attorneys General are active participants in this Settlement helps ensure that the Settlement is fair and reasonable and benefits the entire Plaintiff Class. *See, e.g., State of New York v. Reebok Int'l Ltd.,* 96 F.3d at 48 (observing that the motivating factor for states acting as *parens patriae* for their citizens is the enforcement of the antitrust law); *In re Toys "R" Us Antitrust Litig.,* 191 F.R.D. 347, 351 (E.D.N.Y.2000) (observing that "participation of the State Attorneys General furnishes extra assurance that consumers' interests are protected"); *In re Mid–Atlantic Toyota Antitrust Litig.,* 564 F.Supp. 1379, 1386 (D.Md.1983) (observing that "the presence of public law enforcement officers in the settlement process is an appropriate element for the Court to consider in approving the settlement").

This Court finds that Class Counsel and Counsel for the Litigating States have substantial experience in litigating and resolving similarly complex matters, including pharmaceutical overcharge antitrust cases. This Court also finds that those Counsel negotiated the Settlement Agreement at arm's length, after extensive discovery, and independent analysis of all relevant matters, and thus it defers to Counsel's conclusion that the Proposed Settlement is fair, adequate, and reasonable. At the time the parties entered into the Settlement Agreement, fact discovery had almost been completed. Plaintiffs' Counsel's Declarations and Affidavits reveal that they had (1) thoroughly investigated the claims against Defendants; (2) retained and worked with expert witnesses in evaluating aggregate damages to the Class and Defendants' highly technical production-related causation defenses; and (3) sufficiently developed the facts concerning Defendants' liability and damages to make a highly informed decision regarding the Proposed Settlement.

Counsel for Plaintiffs engaged four expert economists of national reputation to evaluate the economic theory of their claims and potential damages based on sales data produced by Defendants, Plaintiffs, and the pharmaceutical industry itself. Independent of the formal discovery obtained in litigation, Plaintiffs' Counsel also commissioned a data report from IMS, the recognized industry leader in data collection for the pharmaceutical industry. Based upon this information, Plaintiffs were able to make an informed judgment of the merits of their claims, the potential damages arising therefrom, and any potential weaknesses in their arguments. All of this weighs in favor of the Court's approval of the Settlement.

### e-f. The Lack of Objections (and Opt-Outs) by Class Members Highlights the Fairness of the Settlement to Unnamed Class Members and Favors Approval

#### (1) Third Party Payers

Pursuant to Order No. 59, preliminarily approving the Proposed Settlement, more than 13,000 copies of the Notice of Settlement of Class Actions, Proof of Claim, and Notice of Exclusion (the TPP "Notice Packets") were mailed directly to third party payer Class Members in this action in February 2003. A second mailing of more than 13,000 amended TPP Notice Packets were mailed to class members in March 2003. (9/19/03 Glenn Aff. ¶¶ 4–5.)

Notice of the Settlement included a description of the Class, the procedural status of the litigation, description of class members' rights under Fed.R.Civ.P. 23(b)(3), the significant terms of the Settlement, a general description of the proposed plan of allocation of the settlement proceeds, and a description of the process of court approval. The Summary Notice for third party payers was also published in two industry publications. (9/19/03 Glenn Aff. ¶ 6). A toll-free information number established for the benefit of third party payer class members received 563 calls, and an Internet website (*www.cardizemtppsettlement.com*) posted information about the settlement and enabled users to view or download all relevant documents. The website has had more than 11,000 visits. (9/19/03 Glenn Aff. ¶ 9.)

From this large, and largely sophisticated, constituency, the only managed care companies which opted out were the four Individual Blue Cross Plaintiffs, on behalf of themselves and the self-funded plans they administer. Only one other self-funded third party payer plan opted out. The only objection filed by a third party payer, Health Care Services Corporation, was withdrawn after the October 1, 2003 fairness hearing. No other third party payer member of the class has filed an objection to the Settlement. By contrast, more than 1,800 proofs of claim have been filed by third party payers, claiming total CD purchases of more than $1.37 billion. (9/19/03 Glenn Aff. ¶ 10.)

#### (2) Consumers

Pursuant to Order No. 59, preliminarily approving the Proposed Settlement, the consumer settlement administrator, Rust Consulting, Inc., mailed (as of September 12, 2003) 43,551 long-form notice packets to consumers who requested information about the Proposed Settlement through calls or e-

mails. (Pls.' Motion, 9/19/03 Potter Aff. ¶ 6.) The long-form notice packet included a one-page summary letter, an eight-page notice booklet, a four-page common question and answer brochure, and a three-page consumer claim registration and opt-out form. (*Id.* ¶ 5.) In addition, to resolve issues concerning a third party subpoena served by the New York Attorney General's office, Biovail included the summary notice in its magazine *CardiSense,* which it mailed to approximately 137,000 individuals who indicated that they are currently taking Cardizem CD. In addition, Biovail mailed the summary notice to approximately 385,000 individuals who had previously indicated that they had taken Cardizem CD.

The claims administrator also designed and maintained a website on the internet to provide claimants with information about the settlement (*www.cardizemsettlement.com*). As of September 12, 2003, there had been more than 100,000 visits to this website, from which Rust Consulting received 7,757 requests for claim registration packets. (*Id.* ¶ 10.) Rust Consulting also established a toll-free telephone number for consumer class members to obtain recorded information or speak with customer service representatives, beginning on May 13, 2003, and continuing through the present. As of September 12, 2003, more than 95,000 phone calls had been made to the toll-free number, and more than 29,000 callers spoke with customer service representatives. (*Id.* ¶ 17.) In addition, from July 8, 2003, to August 3, 2003, there was a television media campaign to publicize the consumer settlement. Beginning with this campaign, daily calls to the toll-free settlement information number increased fifteen-fold.

As of September 12, 2003, Rust Consulting had received 21,963 proofs of claim via mail and 15,424 claims via the internet. As of September 12, 2003, Rust Consulting had received 316 opt outs, one "comment" that Plaintiffs and the Court respond to as an objection, and one other objection filed by Attorney Gordon Ball on behalf of his client, Ms. Eugenia Wynne Sams. Ms. Sams also filed a notice of intent to appear and be heard through counsel and/or in person at the October 1, 2003 final approval hearing.[13] Accordingly, consumer opt outs to date have been less than 1% of the number of consumer claimants.

A certain number of opt-outs and objections are to be expected in a class action. *See e.g., In re NASDAQ Market–Makers Antitrust Litig.,* 187 F.R.D. 465, 478 (S.D.N.Y.1998) (observing that "[i]n litigation involving a large class, it would be 'extremely unusual' not to encounter objections."). If only a small number of objections are received, that fact can be viewed as indicative of the adequacy of the settlement.[14] *Id.* at 478–79. *See also In re Orthopedic Bone Screw Prods. Liab. Litig.,* 176 F.R.D. 158, 185 (E.D.Pa.1997).

That the overwhelming majority of class members have elected to remain in the Settlement Class, without objection, constitutes the "reaction of the class," as a whole, and demonstrates that the Settlement is "fair, reasonable, and adequate." Moreover, the two objections are not well-founded.

In the first objection filed by a consumer, Mr. Patrick D. Corcoran of Minnetoka, Minnesota, states that "it is wrong to provide a higher level of award to consumers who had no prescription drug coverage than to those consumers who had such coverage which they paid for at their own expense." (Pls.' Motion, Ex. B.) This objection is without merit. As Plaintiffs convincingly explained, the reason cash consumers will be paid a higher recovery amount under the Settlement is that the cost difference between a branded version and a generic version of Cardizem CD would have been as-

---

**13.** This Court, in an effort to better assess the fairness, adequacy and reasonableness of the Proposed Settlement and Allocation Plan, required the appearance of objectors at the October 1, 2003 final approval hearing. (Order No. 75.)

**14.** The only other entities which filed notices of exclusion do not appear to have been class members. Plaintiffs represent that they consist of a credit union with no purchases of CD, and the Sherman Act Individual Plaintiffs, which are chain drug stores whose counsel filed letters in which they state that they do not believe they are class members. (9/19/03 Glenn Aff. ¶ 6.)

sumed entirely by the cash consumer (as opposed to being shared between an insured consumer and his/her insurer). Consequently, the cash consumer's "out of pocket" expense will be higher, and his/her recovery should reflect that difference.

The second objection is filed by counsel Gordon Ball on behalf of Tennessee consumer Eugenia Wynne Sams. Sams raises four objections, all without merit and bordering on frivolousness. To place her objections in context, the Court first examines Ms. Sams' background, and her role in this multi-district litigation.

Ms. Sams took Cardizem CD from June 8, 1993 through August 28, 1998. Sams estimates that she paid approximately $35/month for Cardizem CD. As to her Cardizem CD purchases from June of 1993 through December 1997, Sams testified that after she satisfied her $200 medical deductible, her insurer, BCBS, paid 80% of her prescription costs and she was responsible for the remaining 20%. In January 1998, Sams switched insurers, paying only a $15 co-pay. Sometimes she purchased a one-month supply of Cardizem CD, other times she purchased a three-month supply. Sams has never taken a generic version of Cardizem CD. (Sams' 1/8/02 Dep. at 16–17, 21, 22–25, 33–34, 36, 42–56, 76–78, 86–93.)

At the fairness hearing and at her deposition, Ms. Sams testified that, after Attorney Ball first contacted her in 1998 and asked her if she took Cardizem, and she agreed to file suit against Defendants, she has not taken an active interest in this litigation. Other than reviewing her initial complaint, gathering her personal paperwork concerning her Cardizem CD purchases, appearing at a deposition requested by Defendant HMRI (now Aventis), Ms. Sams has been content to let her attorney, Mr. Ball, monitor this litigation. (Sams' 1/8/02 Dep. at 67, 71, 73–75.)

Sams' action has never been certified as a class. Accordingly, she represents only herself. Her action, along with the others described above, were transferred to this Court by the Judicial Panel on Multidistrict Litigation in June 1999. Pursuant to this Court's Case Management Orders coordinating pretrial proceedings in all the State Law Actions involved in this multidistrict litigation, Co-Lead Counsel was designated for the State Law Plaintiffs and given responsibility for handling all pretrial litigation, discovery, and settlement negotiations. (Case Management Order Nos. 1–8.) Mr. Ball is not one of the counsel so designated by the Court.

After settlement negotiations began, Mr. Ball filed a motion for a suggestion of a remand on behalf of Ms. Sams, arguing that pretrial proceedings had been completed and a remand was required, or, alternatively, Mr. Ball should be allowed to participate in pretrial settlement negotiations. Mr. Ball's motion was denied. In Order No. 45, this Court observed that Mr. Ball's request was contrary to the procedures set forth in this Court's Case Management Order No. 7, ¶ 14 and would frustrate a recognized purpose for consolidating multidistrict litigation for pretrial proceedings. *See Manual for Complex Litigation (Third)* § 31.132 at 254 (1995) (observing that "[o]ne of the values of multidistrict proceedings is that they bring before a single judge all of the cases, parties, and counsel comprising the litigation" and "therefore afford a unique opportunity for the negotiation of a global settlement.... In managing the litigation, therefore, the transferee judge should take appropriate steps to make the most of this opportunity and facilitate the settlement...."). This Court observed that this is an accepted method for creating order out of what would otherwise be chaos if each individual plaintiff's counsel were allowed to engage in uncoordinated discovery and fractured settlement negotiations. *See In re Ivan F. Boesky Sec. Litig.*, 948 F.2d 1358, 1365 (2d Cir.1991) (approving the practice of appointing lead counsel for settlement negotiations in complex multidistrict litigation because "[c]ompelling defendants to negotiate with a single negotiator authorized to speak for all the classes eliminates opportunities for divisive settlement shopping", "promotes fair and comprehensive resolutions", and "diminishes the costs that multilateral bargaining would impose on each class."). (Order No. 45 filed 10/30/02.)

While settlement negotiations were proceeding, Mr. Ball filed a renewed motion for suggestion of remand on behalf of Ms. Sams.

In Order No. 55, this Court denied Mr. Ball's renewed motion, finding that it provided no reason for the Court to depart from the reasoning set forth in Order No. 45. The Court reiterated that coordinated pretrial proceedings were not completed, that Co–Lead Counsel had sole responsibility for pretrial discovery and settlement negotiations, and that this was an accepted method of pretrial management. The Court further observed that, contrary to Sams' arguments, discovery relevant to her claim had been pursued, received, and considered in settlement negotiations between Co–Lead Counsel for the State Law Plaintiffs, the Plaintiff States (including the Attorney General of Tennessee), and Defendants. (Order No. 55 filed 1/29/03.)

Mr. Ball then filed a motion to remand on behalf of Ms. Sams before the Judicial Panel on Multidistrict Litigation ("JPML"). In an Order dated June 17, 2003, the JPML denied Mr. Ball's motion, agreeing with this Court's assessment that a remand of the *Sams* action would be premature because coordinated pretrial proceedings were ongoing.

Sams' first objection merely reargues the remand issue previously rejected twice by this Court and once by the JPML. The objection does not address the fairness, adequacy, or reasonableness of the Proposed Settlement. Accordingly, it is overruled. The second objection is likewise overruled because it fails to address the fairness, adequacy, and reasonableness of the Proposed Settlement and merely restates a legal argument previously rejected by this Court; *i.e.,* that the Tennessee Attorney General lacks authority to represent Tennessee consumers in this action. (Order No. 68.)

Ms. Sams' final two objections do raise fairness concerns. Both address the Proposed Allocation Plan for disbursement of the Settlement Funds and argue that the distribution formula is not fair because it (1) fails to distinguish between states that allow indirect purchasers to recover antitrust damages and those that do not, and (2) fails to distinguish between Tennessee, which Sams' argues allows recovery for full consideration paid by the consumer, and states that do not

allow such recovery. Both objections are overruled.

Class Counsel convincingly argued that the Proposed Allocation Plan is fair, adequate, and reasonable. Distinctions between states' laws were considered during settlement negotiations. It was decided, however, that the Proposed Plan was the best way to get the most cash to consumers. Applying a cost/benefit analysis, it was decided that the increased administration costs necessarily incurred in connection with screening so as to distinguish between consumers of states conferring arguably greater or lesser benefits would result in decreased benefits to consumers. It was also determined that the increased complexity necessarily required on claims forms would decrease the number of consumers taking advantage of this settlement. Settlement always involves a cost/benefit analysis and compromise. This settlement is no different.

Objector Sams does not offer an alternative plan. Moreover, her fairness arguments fail to address the fact that indirect purchaser recovery in Tennessee was not a settled issue at the time the Settlement Agreement was entered into and likewise fail to address the fact that her "full consideration" argument may be more difficult to prove than she portrays. *See Sherwood v. Microsoft Corp.,* No. M2000–01850, 2003 WL 21780975 (Tenn. Ct.App. July 31, 2003); *Orlando's Bakery v. Nutrinova Nutrition Specialities & Food Ingredients ("Sorbates Antitrust Litig."),* No. 99–560–11, Slip Op. at 14–15 (20th Judicial Dist., Davidson County, Tenn. Feb. 6, 2002) (Memorandum and Final Order approving proposed settlement and plan of distribution in class action antitrust suit). Ms. Sams' objections also fail to consider the additional litigation risks, expenses and delay avoided by the Proposed Settlement and Allocation Plan. Finally, this Court observes that, despite her complaints, Objector Sams has chosen not to opt-out of the Settlement Class. Rather, she has chosen to object and file an appeal despite knowledge that, pursuant to the Settlement Agreement, an appeal will delay disbursement of Settlement Funds to consumers who are typically elderly and ill

and at risk of dying before her appeal is heard or decided.

This Court finds that the overwhelming positive Class response to the Proposed Settlement weighs heavily in favor of approval. *See Kogan,* 193 F.R.D. at 502.

### g. The Fact that the Settlement is the Product of Arm's Length Negotiations as Opposed to Collusive Bargaining Favors Approval

This Settlement comes after more than four years of vigorous litigation and is the product of arm's length settlement negotiations among counsel for State Law Plaintiffs and the Plaintiff States and Defendants in a mediation process that consumed almost one year. These negotiations and the ultimate Settlement Agreement were closely monitored by Professor Eric D. Green, an experienced and respected mediator appointed by the Court. Counsel for Plaintiffs and Defendants attended a three-day mediation session in June, 2002, at which time demands and offers were communicated through Professor Green. (9/22/03 Lowey Decl. ¶ 58.) At no time prior to this mediation session had substantive settlement discussions occurred between any Plaintiff and HMRI (now Aventis), and only preliminary negotiations had taken place between State Law Plaintiffs and Andrx. At the conclusion of this mediation session, Plaintiffs and Defendants were unable to agree to any of the material terms of what ultimately became the Settlement Agreement. Thereafter, through numerous telephonic sessions between the parties and with, at times, Professor Green, the process advanced. After two face-to-face conferences between counsel for Plaintiffs and Defendants, the parties were able to finally agree to the terms of the Settlement Agreement. The parties reached impasse frequently during the process, and Professor Green was often called upon to mediate the disputes. (*Id.* at ¶ 60.)

Additionally, in-house counsel for the Class Representatives oversaw negotiations and approved the Settlement and have submitted their declarations in support of final approval. (9/18/03 Lawrence Decl. ¶ 11; 9/19/03 Nash Decl. ¶ 8.) All decisions concerning offers, counter-offers, and acceptance and rejection of settlement offers, were made by Class Representative Plaintiffs Aetna and Cobalt themselves, through their respective in-house counsel, and a committee of the Assistant Attorneys General of the Litigating States, in consultation with Co–Lead Class Counsel. The involvement of States' Attorneys General and in-house counsel for third party payer Class Representatives in this action is further evidence of the arm's length and "client-driven" nature of the Settlement. (9/19/03 Lowey Decl.; 9/18/03 Lawrence Decl.; 9/19/03 Nash Decl.; 9/22/03 Novak Decl.)

In light of the above, this Court finds that the Settlement was negotiated at arm's length, and this factor weighs in favor of approval.

### h. The Settlement's Consistency with Public Interest Favors Approval

There is a strong public interest in private antitrust litigation. *See e.g., Pillsbury Co. v. Conboy,* 459 U.S. 248, 262–63, 103 S.Ct. 608, 74 L.Ed.2d 430 (1983). Likewise, there is a strong public interest in encouraging settlement of complex litigation and class action suits because they are "notoriously difficult and unpredictable" and settlement conserves judicial resources. *Granada,* 962 F.2d at 1205 (internal quotes and citation omitted.) *Accord, In re Warfarin Sodium Antitrust Litig.,* 212 F.R.D. at 254; *Steiner,* 121 F.R.D. at 305. Settlement of this antitrust action serves the public interest by ensuring effective enforcement of the antitrust laws and deterrence of anti-competitive conduct in the marketplace. *See Minnesota Mining & Mfg. Co. v. New Jersey Wood Finishing Co.,* 381 U.S. 311, 318, 85 S.Ct. 1473, 14 L.Ed.2d 405 (1965). This is particularly important in the pharmaceutical industry where the potential harm to society caused by agreements to prevent or delay entry of cheaper generic products has recently received considerable attention.

### 4. Conclusion

Having considered the above, this Court finds that the proposed Settlement merits FINAL APPROVAL.

## C. Approval of the Allocation Plan

■ Plaintiffs also seek approval of their Plan of Allocation which allocates the settlement funds, net of Court-approved fees and expenses ("Net Settlement Fund").[15] For the following reasons, this Court APPROVES Plaintiffs' Plan of Allocation.

First, the only third party payer class member that had objected to the Plan of Allocation, Health Care Services Corporation, withdrew the objection after the October 1, 2003, fairness hearing.

Second, only two consumer class member have objected to the Plan of Allocation, and, as discussed above, those objections are without merit.

Third, the Plan provides a fair and reasonable method of calculating Class member damages based on each Class member's actual purchase of CD, in conformance with Plaintiffs' experts' damage calculation methodology; and also provides a fair and reasonable method for determining each Class members' *pro rata* share of the Net Settlement Fund.

Fourth, the Plan adequately describes: (1) the method of calculating each Class member's damages and *pro rata* share of the Net Settlement Fund; (2) the contents and method of disseminating a Claims Notice form; (3) the manner in which claims will be initially reviewed and processed; and (4) the process for handling and resolving challenged claims. It also includes deadlines for completing tasks related to distributing each Class member's *pro rata* share of the Net Settlement Fund: (1) preparation and dissemination of the Claims Notice form; (2) receipt by the Settlement Administrator of completed Claims Notice forms and supporting documentation; (3) curing deficiencies in any Claims Notice form or supporting documentation submitted by Class members; and (4) challenging and resolving disputes over the Settlement Administrator's determination of each Class member's distribution amount.

## D. Approval of State Law Class Plaintiffs' Counsels' Joint Petition for Attorneys' Fees, Reimbursement of Expenses and Incentive Awards

State Law Class Plaintiffs' Counsel ("Plaintiffs' Counsel") also filed a Joint Petition for Attorneys' Fees, Reimbursement of Expenses and Incentive Awards for Named Plaintiffs. The joint petition is made on behalf of 21 law firms representing Plaintiffs in numerous actions brought in various state and federal courts nationwide. Specifically, Plaintiffs' Counsel request that the Court (1) approve an award of $13,600,000 (17% of the gross settlement fund), plus 17% of interest accrued on escrowed settlement funds to Plaintiffs' Counsel for attorneys' fees; (2) approve reimbursement to Plaintiffs' Counsel of $1,355,045.98 for current expenses incurred in connection with this litigation;[16] and (3) approve incentive awards to certain representative plaintiffs in the following amounts: $75,000 each for Aetna and Cobalt, and $2,500 each for four individual plaintiffs. For the reasons set forth below, the Court GRANTS Plaintiffs' Counsel's requests.

### 1. Attorneys' Fees and Interest

■ This Court finds that the percentage-of-the-fund method is the proper method for compensating Plaintiffs' Counsel, and that an attorneys' fee award of 17% of the Settlement Fund plus 17% of the accrued interest in the Settlement Fund, is reasonable under the circumstances presented here. Courts in the Sixth Circuit have approved similar percentage awards, and consideration of factors identified by the Sixth Circuit justify such an award.

### a. Reasonable Percentage–of–the–Fund Attorneys' Fees are Properly Awarded in Common Fund Cases

■ The Settlement Fund is a "common fund," and it is well established that "a lawyer who recovers a common fund for the benefit of persons other than himself or his

---

**15.** The specifics of how the Consumer Settlement Fund will be distributed to consumers will be the subject of a further motion once all claims are processed.

**16.** Plaintiffs' Counsel informs the Court that it will seek approval of additional expenses incurred up to the date of final distribution to Class members at an appropriate time.

client is entitled to a reasonable attorney's fee from the fund as a whole." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478, 100 S.Ct. 745, 62 L.Ed.2d 676 (1980). Trial courts within the Sixth Circuit have discretion to calculate an award of attorneys' fees by using either (1) a percentage of the fund calculation, or (2) a lodestar/multiplier approach. *Rawlings v. Prudential–Bache Properties, Inc.*, 9 F.3d 513, 516–17 (6th Cir.1993). The overriding requirement is that the award "be reasonable under the circumstances." *Id.* at 516.

In *Rawlings*, the Sixth Circuit observed that the recent trend has been towards application of a percentage-of-the-fund method in common fund cases. *See id.* As recognized by this Court in Order No. 49, courts in the Sixth Circuit have indicated their preference for the °percentage-of-the-fund method in common fund cases. *See, e.g., In re F & M Distributors, Inc. Sec. Litig.*, Case No. 95–CV–71778–DT, 1999 U.S. Dist. LEXIS 11090 (E.D. Mich. June 29, 1999) (choosing percentage-of-the-fund as the better method for determining attorneys' fees in a securities class action); *In re Rio Hair Naturalizer Prods. Liab. Litig.*, MDL No. 1055, 1996 WL 780512, *16 (E.D.Mich. Dec.20, 1996) (observing that "more commonly, fee awards in common fund cases are calculated as a percentage of the fund created, typically ranging from 20 to 50 percent of the fund"); *Fournier v. PFS Invs., Inc.*, 997 F.Supp. 828, 832–33 (E.D.Mich.1998) (choosing percentage-of-the-fund method in class action securities litigation). In *Fournier*, the court observed that:

> The lodestar method should arguably be avoided in situations where such a common fund exists because it does not adequately acknowledge (1) the result achieved or (2) the special skill of the attorney(s) in obtaining that result. Courts and commentators have been skeptical of applying the formula in common fund cases.... [M]any courts have strayed from using lodestar in common fund cases and moved towards the percentage of the fund method which allows for a more accurate approximation of a reasonable award for fees.

*Id.* at 831–32 (internal citations omitted).

This Court agrees, as it did in Order No. 49, with Judge Cook's observations in *F & M Distribs. Inc. Sec. Litig.*, that (1) "the lodestar method is too cumbersome and time-consuming of the resources of the Court"; and (2) "more importantly, the 'percentage of the fund' approach more accurately reflects the result achieved." 1999 U.S. Dist. LEXIS 11090, at *8 (internal quotes and citations omitted). This Court's decision to apply the percentage-of-the-fund method is consistent with the majority trend, and, more importantly, is reasonable under the circumstances presented here.

### b. The Requested Fee is Within the Range Considered Reasonable and Fair

Applying the percentage of the fund approach, this Court finds that the requested fee in the amount of 17% of the Settlement Fund is fair and reasonable in light of the complex legal and factual difficulties and substantial procedural difficulties presented in this litigation. In 1998, when these cases began, Aetna negotiated a fee structure which allowed it to limit the amount of legal fees Plaintiffs' Counsel would request from the Court to 17% of the gross recovery obtained. (9/19/03 Lawrence Decl. ¶ 5.) Aetna and Cobalt fully support Plaintiffs' Counsel's petition for a fee equal to 17% of the gross settlement. (*Id.* at ¶ 13; 9/19/03 Nash Decl. ¶ 10.)

The State Attorneys General likewise support Plaintiffs' Counsel's fee petition. These State Attorneys General, represented by very experienced staff counsel, worked closely with Plaintiffs' Counsel from the time they first became involved in this litigation, and recognize the significant work, achievement, and risk undertaken by Plaintiffs' Counsel prior to their intervention.

The requested 17% fee is well within the 20–30% range of reasonable attorneys' fees generally awarded in this Circuit. *See F & M Distribs. Inc. Sec. Litig.*, 1999 U.S. Dist. LEXIS 11090, at *8–10 (awarding a 30% fee award after observing that "[w]hen using a percentage-of-the-fund approach to calculate attorneys' fees, twenty-five percent has traditionally been the benchmark standard, 'with the ordinary range for attorney's fees between 20–30%.' ") (quoting *Fournier*, 997

F.Supp. at 832). *See also In re Kmart Corp. Sec. Litig.*, Consolidated Master File No. 95–CV–75584, 1998 U.S. Dist. LEXIS 23092, at *21 (E.D.Mich. Oct. 30, 1998) (awarding attorneys' fee of 20% of the common fund); *Manners v. Am. Gen. Life Ins. Co.*, No. 3–98–0266, 1999 WL 33581944, at *7, 1999 U.S. Dist. LEXIS 22880, at *20 (M.D.Tenn. Aug. 11, 1999) (awarding attorneys' fees of 20% of the common fund). This Court, in Order No. 49, awarded Sherman Act Class Counsel 30% of a $110 million settlement fund. State Law Class Plaintiffs' Counsel faced similar legal and procedural difficulties as the Sherman Act Class Counsel during the course of this litigation, and also faced substantial additional difficulties as indirect purchasers.

### c. Evaluating Sixth Circuit Factors, the Requested Fee is Reasonable

██ Courts in the Sixth Circuit evaluate the reasonableness of a requested fee percentage award using six factors: (1) the value of the benefit rendered to the plaintiff class; (2) the value of the services on an hourly basis; (3) whether the services were undertaken on a contingent fee basis; (4) society's stake in rewarding attorneys who produce such benefits in order to maintain an incentive to others; (5) the complexity of the litigation; and (6) the professional skill and standing of counsel involved on both sides. *Bowling v. Pfizer, Inc.*, 102 F.3d 777, 780 (6th Cir.1996); *Smillie v. Park Chem. Co.*, 710 F.2d 271, 275 (6th Cir.1983).

Considering the above factors, this Court finds that Plaintiffs' Counsel's requested fee award is reasonable under the circumstances. First, the result obtained on behalf of the Class is extraordinary and fully supports the requested fee percentage. As discussed above, the Settlement represents a very high percentage of the total damages to the Class as estimated by separate experts retained by State Law Plaintiffs and the State Attorneys General.

Secondly, there is no question that Plaintiffs' Counsel spent thousands of hours litigating this complex case over the past five years. Counsel's work throughout the substantial motion practice and discovery process has been of the highest quality. The requested fee percentage would equate to a lodestar multiplier of approximately 1.2. This is both reasonable and well within the range of multipliers awarded by courts in complex cases such as this. *See Manners*, 1999 WL 33581944, at *31, 1999 U.S. Dist. LEXIS 22880, at *93 (awarding multiplier of 3.8 and observing that "[t]his multiplier is well within the range of multipliers for similar litigations, which have ranged from 1–4 and have reached as high as 10."); Order No. 49 at 20 (awarding Sherman Act Class Plaintiffs 30% of the common fund and finding that a lodestar multiplier of 3.7 was reasonable under the circumstances). The Court is also mindful that Plaintiffs' Counsel's services will still be needed to assist in the claims resolution process and may be needed to defend any objectors' appeals.

The third through sixth factors also support the requested attorneys' fee. Plaintiffs' Counsel undertook representation of the Class on a contingent fee basis, thus bearing the risk of recovery inherent in litigation, and expended millions of dollars in attorney time and expenses in their prosecution of this litigation over the past five years. Plaintiffs' Counsel also faced the substantial legal talent and financial resources of Defendants, which increased the risk of litigating this action.

Moreover, the complexity of this case cannot be overstated. Antitrust class actions are inherently complex, and this case in particular presented a number of complicated factual and legal issues. As previously recognized in Order No. 49, this extraordinarily complex case raised a multitude of difficult issues in the areas of antitrust law, patent law, and laws governing pharmaceutical drugs. (Order No. 49 at 4.) These included:

- regulatory issues arising out of the Hatch–Waxman Act;
- patent law issues relevant to the Defendants' patent litigation underlying the September 1997 Agreement;
- the intricacies of the pharmaceutical industry from a sales and marketing perspective;
- the scientific and production processes involved with investing and commercial-

izing branded and generic pharmaceutical productions; and

- the FDA regulations applicable to reviewing and approving pharmaceutical products and new manufacturing facilities and processes.

(Order No. 49 at 20–21.) Notwithstanding this complexity, Plaintiffs' Counsel, from the very beginning of this litigation, demonstrated a thorough understanding of the case, the industry, Defendants' business operations, and effectively and efficiently prosecuted and settled this matter.

This Court would be remiss if it failed to acknowledge the high level of competence, experience, skill and hard work demonstrated by Counsel on both sides throughout this litigation. Both Plaintiffs' Counsel and Defendants' Counsel are all seasoned, highly competent professionals with years of experience in litigating complex antitrust actions. From the date this action began, Plaintiffs' Counsel has aggressively prosecuted and Defendants' Counsel has vigorously defended on their clients' behalf, while displaying the utmost skill, courtesy, and professionalism.

Finally, this Court considers society's stake in rewarding attorneys who produce such benefits in order to maintain an incentive to others. As already noted, Plaintiffs' Counsel obtained an excellent settlement for the Class in this complex and hard-fought case. "Society's stake in rewarding attorneys who can produce such benefits in complex litigation such as in the case at bar counsels in favor of a generous fee. . . ." *F & M Distribs., Inc. Sec. Litig.,* 1999 U.S. Dist. LEXIS 11090, at *18. Society also benefits from the prosecution and settlement of private antitrust litigation. *See, e.g., Pillsbury Co.,* 459 U.S. at 262–63, 103 S.Ct. 608; *Minnesota Mining & Mfg. Co.,* 381 U.S. at 318, 85 S.Ct. 1473. Furthermore, in bringing this litigation, Plaintiffs' Counsel focused the attention of the FTC, the United States Congress, state legislatures, and State Attorneys General on anticompetitive conduct in the pharmaceutical industry that delays generic competition. This litigation has elevated the

public debate on the intersection of patent and antitrust law. Congress has since worked to amend Hatch–Waxman's exclusivity provisions to curb the very abuses alleged in this action, and the President of the United States issued an Executive Order directed at those abuses (*www.whitehouse.gov/news/releases/2002/10/20021021-2.html*). This case has helped put prescription drug pricing and marketing tactics at the forefront of media, Congressional, and judicial scrutiny. Encouraging qualified counsel to bring inherently difficult and risky but beneficial class actions like this case benefits society.

### d. The Class Representatives Support the Fee Petition and Class Members Have Not Objected to the Requested Fee

Following notice to the Class of the Proposed Settlement and disclosure that State Law Plaintiffs' Counsel would request 17% of the aggregate settlement amount, no Class members have objected to the contemplated award of attorneys' fees. In light of the composition of the Class, which includes sophisticated, knowledgeable health insurers that have a significant stake in the outcome of this litigation, the absence of objection is remarkable. As previously noted, Class Representatives Aetna and Cobalt fully support the fee request. (9/18/03 Lawrence Decl. ¶ 13; 9/19/03 ¶ 9.) This favorable response lends further support to this Court's conclusion that the requested fee is reasonable and fair.

### e. Conclusion

Taking into consideration the above factors, this Court awards Plaintiffs' Counsel 17% of the Settlement Fund, plus 17% of the accrued interest on the Settlement Fund.

### 2. Reimbursement of Reasonable Expenses

▮ In addition to their request for Attorneys' fees, Plaintiffs' Counsel seek reimbursement of $1,355,045.98 in expenses.[17]

---

17. The Class was notified that Plaintiffs' Counsel would apply for fees and expenses totaling approximately $16 million. (Pls.' Prelim. Approval Motion, Ex. H, Notice of Settlement of Class

Under the common fund doctrine, class counsel is entitled to reimbursement of all reasonable out-of-pocket litigation expenses and costs in the prosecution of claims and in obtaining settlement, including expenses incurred in connection with document productions, consulting with experts and consultants, travel and other litigation-related expenses. "Expense awards are customary when litigants have created a common settlement fund for the benefit of a class." *F & M Distribs., Inc. Sec. Litig.,* 1999 U.S. Dist. LEXIS 11090, at *20 (approving reimbursement of $584,951.20 in expenses).[18]

Upon review of the numerous affidavits submitted by Plaintiffs' Counsel in support of this request, the Court finds the requested amount to be fair and reasonable. (Pls.' Jt. Petition, Expense Decl., Exs. B–V.) In determining whether the requested expenses are compensable in this common fund, the Court has considered whether the particular costs are the type routinely billed by attorneys to paying clients in similar cases. *See In re Synthroid Marketing Litig.,* 264 F.3d 712, 722 (7th Cir.2001). The Court finds that the categories of expenses for which Plaintiffs' Counsel seek reimbursement are the type routinely charged to their hourly fee-paying clients and thus should be reimbursed out of the Settlement Fund. Likewise, considering the detailed affidavits submitted in support of the request for reimbursement, this Court is persuaded that these expenses are reasonable.

### 3. Incentive Awards to Named Plaintiffs

█ Finally, Plaintiffs' Counsel request the approval of incentive awards to six of the representative plaintiffs in this action—two institutional and four consumer plaintiffs—whose contributions to the litigation merit special consideration. Such awards are common in class actions such as this. *See F & M*

*Distribs., Inc. Sec. Litig.,* 1999 U.S. Dist. LEXIS 11090, at *20. In Order No. 49, this Court approved incentive awards to the Sherman Act Class Plaintiff representatives. Similar to the named plaintiffs in that action, the named Plaintiffs identified to receive incentive awards here each undertook varying levels of burden and risk on behalf of the Class. These Plaintiffs incurred significant demands on their time and expenses, including submission to depositions and responding to discovery requests for the benefit of absent Class members.

The Notice to the Class advised that Plaintiffs' Counsel would seek incentive awards up to $250,000 in the aggregate. No Class members objected. The requested incentive awards total only $160,000, with $75,000 each for Aetna and Cobalt, and $2,500 each for Plaintiffs Betty Morris, Charles Zuccarini, Larry S. Sizemore, and Marshall J. Ross. The Court GRANTS Plaintiffs' Counsel's request. These incentive awards equal only two-tenths of one percent (.002%) of the Settlement Fund and are well-deserved.

In this litigation, Aetna's and Cobalt's corporate counsel, pharmacy benefits personnel and administrative personnel were required to dedicate hundreds of hours of time to the prosecution of these cases and responses to discovery. (9/18/03 Lawrence Decl. ¶¶ 4–12; 9/19/03 Nash Decl. ¶¶ 4–8; 9/19/03 Bartlett Decl. (Cobalt).) Plaintiff Aetna provided the Class with the services of corporate counsel Gerald Lawrence throughout the five-year history of this litigation. (9/18/03 Lawrence Decl. ¶¶ 4–12.) Aetna also provided the Class with the services of two senior executives of its pharmacy benefits division, as well as the assistance of numerous other employees. (*Id.* ¶¶ 4, 7, 9.) Plaintiff Cobalt provided the Class with five of its corporate counsel, its principal fraud investigator, and its pharmacy benefits manager to aid in the

---

Action.) Plaintiffs' Counsel are requesting an attorneys' fee award of $13,600,000 plus 17% of interest accrued on the Settlement Fund, and reimbursement of expenses currently totaling approximately $1,355,045.98. Thus, the amount actually sought by Plaintiffs' Counsel for fees and expenses (approximately $15 million) is almost $1 million less than the amount set forth in the Notice.

**18.** Plaintiffs' Counsel advise that they will, at the appropriate time, also seek reimbursement of additional expenses up until the date of final distribution incurred in connection with settlement administration and possible appeals.

prosecution of this case. (9/19/03 Bartlett Decl. ¶ 5; 9/19/03 Nash Decl. ¶ 5.) Aetna and Cobalt's efforts included (1) investigating the case with outside counsel before filing the class action complaint, (2) negotiating a fee agreement with Class Counsel with limitations that benefit the entire class financially, (3) responding to Defendants' discovery demands, (4) sending in-house counsel to New York for numerous settlement discussions with Defendants, and (5) directing Class Counsel in the negotiation of the Settlement in this action. (9/18/03 Lawrence Decl. ¶¶ 3–12; 9/19/03 Nash Decl. ¶¶ 4–8; 9/22/03 Lowey Decl. ¶¶ 8, 28–29, 59, 62; 9/19/03 Bartlett Decl. ¶ 5.)

Individual named Plaintiffs, Betty Morris, Charles Zuccarini, Larry S. Sizemore, and Marshall J. Ross, deserve incentive awards because they devoted a significant amount of time to the prosecution of this matter for the benefit of absent Class members, including oral depositions and responses to discovery requests.

### E. State Attorneys' General Motion for Attorneys' Fees and Enforcement Costs

▆▆▆ The State Attorneys General also seek approval of their application for $2.5 million in attorneys' fees and enforcement costs. Of the $2.5 million sought, approximately $1,766,480.97 is allocated to attorneys' fees based upon the time devoted to this case by the Litigating States. (State AGs' Motion, Ex. A.) The remaining amount, approximately $733,519.03, is allocated to enforcement costs incurred in connection with prosecuting this case. (State AGs' Motion, Ex. B.) The $2.5 million in attorneys' fees and enforcement costs, if approved, are to be divided between the States as they deem appropriate. For the reasons stated below, this Court GRANTS the State Attorneys' General motion.

Through the cooperative efforts of the State Attorneys' General and State Law Plaintiffs in years of pre-litigation investigation, litigation, and settlement negotiation, a substantial and fair settlement has been achieved with all Defendants, providing $80 million in cash for distribution to consumers, third party payers, and designated governmental entities. In the States' Settlement Agreement with Defendants, the States agreed to cap their combined attorneys' fees and costs at $2.5 million. The requested combined attorney fee and cost award is reasonable and fair to consumers in the Plaintiff States.

From the time they entered this litigation, Litigating States have aggressively prosecuted their claims against Defendants. They participated in more than twenty-five depositions held in various parts of the United States. (9/22/03 Novak Decl. ¶ 7.) Litigating States received, analyzed, and produced over 35,000 pages of document and electronic drug utilization data covering millions of transactions from their own respective state departments and agencies. (Id. at ¶ 8.) They consulted with economic experts familiar with the pharmaceutical industry, who reviewed detailed purchasing data for Cardizem CD and its generic bioequivalents, to assess the damages that consumers and state departments and agencies each suffered. (Id. at ¶ 9.) They engaged in months of hard-fought settlement negotiations, which included an intensive three-day in-person mediation session, two additional in-person negotiations, several follow-up telephonic mediation sessions with Eric Green, the nationally recognized mediator approved by the Court, and numerous direct negotiations between counsel, before settlement was reached.

#### 1. The Requested Attorneys' Fees Are Fair and Reasonable

##### a. The "Percentage of the Fund" Method is Appropriate to Determine Attorneys' Fees

As discussed above, the Sixth Circuit has acknowledged that the trend of the courts in different federal judicial circuits has been to employ the percentage of the fund method to calculate attorneys' fees in common fund cases. *Rawlings,* 9 F.3d at 515–16 (citing *Swedish Hosp. Corp. v. Shalala,* 1 F.3d 1261 (D.C.Cir.1993); *Camden I Condo. Ass'n, Inc. v. Dunkle,* 946 F.2d 768 (11th Cir.1991); *Court Awarded Attorneys Fees,* Report of the Third Circuit Task Force, 108 F.R.D. 237

(1985)). As this Court has previously held, application of the percentage-of-the-fund approach is appropriate under the circumstances presented in this litigation. (Order No. 49 at 17–18.)

### b. The Requested Percentage Fee is Reasonable

This Court has already articulated the applicable standard for determining the reasonableness of a percentage fee. These include the following six factors, identified by the Sixth Circuit: (1) the value of the benefit rendered to the plaintiff class; (2) the value of the services on an hourly basis; (3) whether the services were undertaken on a contingent fee basis; (4) society's stake in rewarding attorneys who produce such benefits in order to maintain an incentive to others; (5) the complexity of the litigation; and (6) the professional skill and standing of counsel involved on both sides. *Bowling*, 102 F.3d at 780; *Smillie*, 710 F.2d at 275.

This Court finds that the State Attorneys General requested fee recovery of approximately $1.76 million (approximately 2.2% of the total recovery of $80 million) is reasonable under the facts articulated by the Sixth Circuit.

First, the "value of the benefit rendered to the plaintiff class" is substantial. Through the efforts of the State Attorneys General, working in tandem with the State Law Plaintiffs, a substantial cash settlement of $80 million was obtained. As discussed above, this $80 million settlement is an excellent result and compares favorably with the $110 million received by the Direct Purchasers in the Direct Purchaser Class Settlement.

Second, the State Attorneys' General fee is an appropriate figure when considering the "value of services on an hourly basis." Over 14,000 hours were spent collectively by the Litigating States with over 12,000 of that total expended by Assistant Attorneys General. (State AGs' Motion, Ex. A.) Based upon this figure, an attorneys' fee award of approximately $1.76 million would yield a blended hourly compensation rate of less than $150 per hour. Attorneys' fees for Assistant Attorneys General should be assessed with reference to the fee that a private prac-

titioner with comparable experience and skill would charge. *Illinois v. Sangamo Constr. Co.*, 657 F.2d 855, 860 (7th Cir.1981). Under this standard, a blended rate of less than $150 per hour compares favorably with the rates at which private antitrust practitioners of similar experience and skill would charge their clients.

Third, the Court assesses "whether the services were undertaken on a contingent fee basis." They were not. This should not, however, be a basis for denying the requested fee award. Many state antitrust laws expressly provide that the state is entitled to "reasonable attorneys fees" without regard to whether the fees are on a contingency basis or not. *See, e.g.*, Mich. Comp. Laws Ann. § 445.778(1).

Fourth, the Court considers "society's stake in rewarding attorneys who produce such benefits in order to maintain an incentive to others." An award of attorneys' fees to the States benefits state governments in a time of constrained budgets and limited resources. As observed by the United States Court of Appeals for the Seventh Circuit, awarding reasonable attorneys' fees to state enforcers, particularly during periods when state budgetary resources are constrained, provides an incentive for states to enforce antitrust laws in the face of anti-competitive injuries. *Sangamo Constr. Co.*, 657 F.2d at 860.

Fifth, the Court evaluates "the complexity of the litigation." This Court has already discussed the complexity of this case. This was not the typical *per se* price-fixing conspiracy where sellers of a commodity were indicted and pled guilty, and damages were readily ascertained. Rather, this case presented difficult legal and logistical problems which Plaintiff States were able to surmount. Each legal issue was hotly contested, and the damage aspects of the case alone presented Plaintiff States with the Herculean task of gathering, coordinating, and studying pricing information from the multitude of state departments, agencies, and compacts that either purchased or provided pharmacies with reimbursements for the purchase of Cardizem CD. This information, collected over

many months for over 120 separate governmental entities in the 29 Litigating States, included electronic data that recorded millions of transactions. (9/22/03 Novak Decl. ¶ 8.) The State Attorneys General additionally obtained and analyzed approximately $241,000 worth of data from IMS Health, Inc., the recognized leader in data collection for the pharmaceutical industry.

The Litigating States faced particular challenges in addressing the discovery obligations of those 120 separate governmental agencies, each of whom received discovery requests from Defendants regarding purchase data, rebate relationships, the existence of drug utilization review procedures, the ability to substitute alternative products for Cardizem CD, and a host of other factors. These complexities were in addition to a host of other complexities involved in this case; i.e., the FDA regulatory approval process, complex manufacturing defenses raised by Defendants, and other issues discussed above.

Finally, the Court evaluates "the professional skill and standing of counsel involved on both sides" of the litigation. Again, as discussed above, Defendants in this case both retained counsel whose reputations in the antitrust community are well established. The Litigating States also had the benefit of several Assistant Attorneys General who have multiple years of state and federal *parens patriae* and class action experience, much of it involving the pharmaceuticals industry. (State AGs' Motion, Ex. A.) The expertise of the State Attorneys General in the area of complex antitrust and class action litigation has been recognized by the federal judiciary. *In re Lorazepam & Clorazepate Antitrust Litig.*, 205 F.R.D. at 380.

### c. Conclusion

Applying the above factors, this Court concludes that the requested attorneys' fee is fair and reasonable. When the State Attorneys General "entered the fray" in this case, State Law Plaintiffs were faced with the prospect of fighting class action certification decisions on a state-by-state basis. Although Defendants challenged the State Attorneys' General enforcement powers, it is difficult to refute the argument that the State Attorneys' General civil penalty powers, disgorgement rights, *parens patriae* and functionally equivalent authority, and other unique enforcement tools brought greater bargaining support to Plaintiffs and improved the benefit of settlement to consumers and the Class. Moreover, the State Attorneys' General work here is not finished. They will continue to manage the processing of an anticipated 50,000 consumer claim forms, to answer inquiries from consumers, and to supervise the distribution of the Settlement Fund.

### 2. The Requested Expenses Are Reasonable

The State Attorneys General also request that they be reimbursed $733,519.03 for expenses they reasonably incurred in the prosecution of this case. Upon review of the documentation provided in support of this request, the Court finds the requested expenses were reasonable and necessarily incurred in connection with the prosecution of this matter. (State AGs' Motion, Ex. B; 9/22/03 Novak Decl.) The State Attorneys General reasonably incurred expenses to prepare expert liability and damages analysis, to obtain approximately $241,000 worth of data for experts' analysis supplied by IMS Health Inc., to pay for depositions and transcripts, travel, telephone long distance charges, and research charges. Accordingly, this Court approves the reimbursement of $733,519.03 in expenses to the State Attorneys General.

## III. Conclusion

For the foregoing reasons, this GRANTS (1) the Joint Motion of State Law Class Plaintiffs and State Attorneys General for Final Approval of the Class Action Settlement and Plan of Allocation, (2) State Law Class Plaintiffs' Counsels' Joint Petition for Attorneys' Fees, Reimbursement of Expenses and Incentive Awards for Named Plaintiffs, and (3) State Attorneys' General Motion for Attorneys' Fees and Enforcement Costs.